**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAUL TERRION and JODY EBERHART, and on behalf of the STATES of CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, IOWA, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, VERMONT, the Commonwealth of MASSACHUSETTS, the Commonwealth of VIRGINIA, the Commonwealth of PUERTO RICO, the DISTRICT OF COLUMBIA, the City of CHICAGO, the City of HALLANDALE BEACH, BROWARD COUNTY, and MIAMI-DADE COUNTY, | Civil Action No.: |
| | |
| | *QUI TAM* **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE & LOCAL COUNTERPARTS** |
| *Plaintiffs/Relators*, | |
| | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | |
| POINT BLANK ENTERPRISES, INC. 2102 SW 2nd Street Pompano Beach, FL 33069 | **JURY TRIAL DEMANDED** |
| JLL PARTNERS, LLC 245 Park Avenue, Suite 1601 New York, NY 10167 | |
| SUN CAPITAL PARTNERS, INC. 5200 Town Center Cir., 4th Floor Boca Raton, FL 33486 | |
| RIVAL TECHNOLOGIES, LLC 2222 W. Parkside Lane #121 Phoenix, AZ 85027 | |
| GALLS, LLC 1340 Russell Cave Rd Lexington, KY 40505 | |
| JOHN DOES NOS. 1-50, FICTITIOUS NAMES, | |
| *Defendants*. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................................4

II.   JURISDICTION AND VENUE .......................................................................................8

III.  PARTIES ...........................................................................................................................8

    A.   Relators ..................................................................................................................8

    B.   Defendants .............................................................................................................9

        1.   Point Blank Enterprises, Inc. ...................................................................9

        2.   JLL Partners, LLC ..................................................................................10

        3.   Sun Capital Partners, Inc. ......................................................................10

        4.   Rival Technologies, LLC........................................................................11

        5.   Galls, LLC...............................................................................................11

        6.   John Does Nos. 1-50, Fictitious Names...................................................11

IV.   BACKGROUND ..............................................................................................................12

    A.   The False Claims Act............................................................................................12

    B.   Body Armor Purchase Process.............................................................................13

        1.   U.S. Military and Federal Government Purchases....................................15

        2.   State and Local Law Enforcement Purchases ..........................................16

V.    DEFENDANTS' FRAUDULENT SCHEME ................................................................17

    A.   Industry Standards and Ordinary Use ..................................................................17

    B.   Defendants' SSBS Vests ......................................................................................19

    C.   Laboratory Test Data Confirm the SSBS Vests Are Defective ...........................25

    D.   PBE's Defective Vests Pose an Extreme Safety Hazard......................................27

    E.   The SSBS Is Uniformly Defective in Manufacture, Materials, Workmanship, and Design........................................................................................................29

    F.   PBE Actively Concealed the Defects in the SSBS Vests ....................................30

VI.   CAUSES OF ACTION ....................................................................................................36

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ...........................36

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ..........................36

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))........................37

COUNT IV (Violation of California False Claims Act).....................................................37

COUNT V (Violation of Delaware False Claims and Reporting Act) ..............................38

COUNT VI (Violation of District of Columbia False Claims Act)..................................39

COUNT VII (Violation of Florida False Claims Act) ......................................................39

COUNT VIII (Violation of Hawaii False Claims Act) .....................................................40

COUNT IX (Violation of Illinois False Claims Act) ........................................................41

COUNT X (Violation of Indiana Medicaid False Claims and Whistleblower
    Protection Act) .........................................................................................................42

COUNT XI (Violation of Iowa False Claims Act) ...........................................................42

COUNT XII (Violation of Massachusetts False Claims Act) ..........................................43

COUNT XIII (Violation of Minnesota False Claims Act) ...............................................44

COUNT XIV (Violation of Montana False Claims Act) ..................................................45

COUNT XV (Violation of Nevada False Claims Act) ......................................................46

COUNT XVI (Violation of New Jersey False Claims Act) ..............................................46

COUNT XVII (Violation of New Mexico Fraud Against Taxpayers Act) .......................47

COUNT XVIII (Violation of New York False Claim Act) ...............................................48

COUNT XIX (Violation of North Carolina False Claims Act) ........................................49

COUNT XX (Violation of Oklahoma Medicaid False Claims Act) .................................50

COUNT XXI (Violation of Rhode Island False Claims Act) ...........................................50

COUNT XXII (Violation of Tennessee False Claims Act) ..............................................51

COUNT XXIII (Violation of Vermont False Claims Act) ...............................................52

COUNT XXIV (Violation of Virginia Fraud Against Taxpayers Act) ............................53

COUNT XXV (Violation of Puerto Rico False Claims Act) ...........................................54

COUNT XXVI (Violation of Chicago False Claims Ordinance) .....................................54

COUNT XXVII (Violation of Hallandale Beach False Claims Ordinance) .....................55

COUNT XXVIII (Violation of Broward County False Claims Ordinance) ......................56

COUNT XXIX (Violation of Miami-Dade False Claims Ordinance) ..............................56

VII.    PRAYER FOR RELIEF ...................................................................................................57

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
## AND STATE AND LOCAL COUNTERPARTS

On behalf of the United States of America ("United States"); eighteen States, the District of Columbia, and the Commonwealths of Massachusetts, Puerto Rico, and Virginia (collectively, the "Whistleblower States"); and the City of Chicago, the City of Hallandale Beach, Miami-Dade County, and Broward County (collectively, the "Whistleblower Localities"); Relators Paul Terrion and Jody Eberhart ("Relators") hereby file this Complaint against Defendants Point Blank Enterprises, Inc.; JLL Partners, LLC; Sun Capital Partners, Inc.; Rival Technologies, LLC; Galls, LLC; and John Does Nos. 1-50, Fictitious Names (collectively, "Defendants"), pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101

3

*et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; and the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act, 2018 P.R. Act 154 (H.B. 1627) (the aforementioned statutes referred to collectively as the "state Whistleblower Statutes"); pursuant to the Chicago False Claims Ordinance, Chicago Mun. Code §§ 1-21-010 to -060, the City of Hallandale Beach False Claims Ordinance, Hallandale Beach Code of Ordinances §§ 8-201 to -210, the Broward County False Claims Ordinance, Broward Cnty. Code of Ordinances §§ 1-276 to -287, and the Miami-Dade County False Claims Ordinance, Miami-Dade Cnty. Code §§ 21-255 to -266 (the aforementioned ordinances referred to collectively as the "locality Whistleblower Ordinances").

## I.    INTRODUCTION

1.    During the Civil War, the United States Army relied on private contractors to provide necessities such as uniforms, weaponry, and transportation.  Many contractors, motivated by greed, cut corners, providing soldiers with "firearms that would not fire, munitions filled with sawdust instead of gunpowder, and horses and mules that were old, lame, and on occasion blind as well," as well as "uniforms that literally fell apart in the rain."[1]  Facing widespread fraud that compromised soldiers' safety, Congress enacted the False Claims Act, incentivizing individual whistleblowers to assist the government in combating that fraud.[2]

2.    Although the False Claims Act has resulted in the return of tens of billions of dollars to the federal fisc, many unscrupulous individuals and corporations continue to cut the same

---

[1] Robert C. Winters *et al.*, *An Introduction to Crime and Crime Causation* 244 (2014).

[2] *Id.*

corners that plagued the Army and put soldiers at risk during the Civil War. This case is the latest in a long line of government contractors putting profit above safety.

3.      Defendants manufacture body armor worn by military personnel, law enforcement officers, and first responders throughout the country. To differentiate their products in the competitive body armor market, Defendants developed a proprietary shoulder strap system for their vests called a "Self-Suspending Ballistic System" ("SSBS").

4.      Defendants' original SSBS shoulder strap design, manufactured from approximately 2004 to approximately 2009, was robust and well-built, with real hook-and-loop fasteners,[3] a broad surface area at which the fasteners would attach (approximately 8 square inches at each end of the strap), and multiple points of reinforcement (to keep the vest in place even if the straps became unfastened). This design ensured that the shoulder straps would not come unfastened with ordinary use, and that the body armor would remain in place on the user's torso.

5.      Beginning in approximately 2009, in an effort to cut costs, Defendants altered the design of their SSBS shoulder straps. Instead of including multiple points of reinforcement, the straps now attach at only one point on each end. Instead of a broad surface area to which the straps attach, the vest now includes small, half-circle c-clamps, reducing the surface area of the fasteners from approximately 8 square inches to less than 4 square inches at each end of the strap. Instead of using a real hook-and-loop fastener system, the shoulder strap—which formerly had a robust loop fastener material—was replaced with two thin pieces of knit fabric (similar to a t-shirt) glued to neoprene fabric, and the c-clamp—which formerly had a robust, woven hook fastener material—was replaced with a lower-quality hook fastener with a laminated backing.

---

[3] Hook-and-loop fasteners are commonly known by the brand name Velcro.

6.      Individually, each of these cost-cutting measures substantially reduces the quality and durability of the shoulder strap system.  Collectively, they pose a deadly risk to the wearer. Although the knit shirt-like fabric used in Defendants' shoulder straps has some ability to latch onto a hook fastener, it is not designed for use in such a fashion—especially not to support the weight of a bulletproof vest.  This defect is compounded by the small surface area of the fasteners, which is insufficient to maintain a solid grip on the shoulder strap.  In addition, exposing the SSBS straps to heat and moisture—elements commonly encountered by those who wear the vests— causes the SSBS closure rapidly to weaken.  Moreover, the laminated c-clamp fasteners have a tendency to warp over time, bending backwards away from the shoulder strap, further weakening the connection of the shoulder strap to the vest.

7.      All of these defects combine to result in the catastrophic failure of Defendants' body armor under normal use.  Defendants' shoulder straps unexpectedly detach in the line of duty, causing the vests to sink down inside the user's uniform or hang loose outside of the uniform. Either circumstance exposes the wearer to extreme danger and the possibility of death.

8.      Despite their knowledge of these defects, Defendants marketed and sold their SSBS body armor to federal, state, and local government agencies, as well as directly to military personnel, law enforcement officers, and first responders, many of whom are required to wear body armor every day.  Over the past five years, Defendants have sold approximately 450,000 vests, most of which were paid for at least in part with taxpayer funds.

9.      As a result of Defendants' fraud, military personnel, law enforcement officers, and first responders have relied and continue to rely on defective body armor that puts their lives at risk.

10.    As a result of Defendants' misconduct, federal, state, and local government agencies have been defrauded out of hundreds of millions of dollars.

11.    Relators bring this action on behalf of the United States, the Whistleblower States, and the Whistleblower Localities to recover all available damages and civil penalties under the False Claims Act, the state Whistleblower Statutes, and the locality Whistleblower Ordinances. All of these claims are premised upon the Defendants' false claims and statements submitted or caused to be submitted in connection with the sales of defective body armor manufactured by Defendants to the United States and to state, local, and tribal authorities.

12.    A vest that cannot be worn has no value.  Defendants understood that, as a condition of payment, the vests, including the SSBS strap system, were required to satisfy their five-year warranties by remaining fit for use as body armor for five years.

13.    Defendants knowingly submitted or caused to be submitted false claims for payment or made false statements about the defective SSBS vests.  These claims were false because the vests for which these claims were submitted were defective, and thus, in each instance, the contracted-for item—a non-defective bulletproof vest—was never delivered.  The vests were defective because they did not meet the industry standard of maintaining performance over five years; contractual requirements with federal, state, and local entities requiring the vests to perform the functions of their intended use; and the government's expectations that the vests would continue to meet performance standards over the course of their five-year warranty period—a warranty which was incorporated into the relevant contracts. Further, Defendants fraudulently induced the government's purchases by withholding data and information about the defectiveness of the SSBS vests.

7

14.    Had the governmental entities that paid for the vests known they were defective, the entities would not have paid for the vests.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over claims brought on behalf of the Whistleblower States and Whistleblower Localities pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a).

16.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

17.    Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendants own and operate businesses within this judicial district, and certain acts that form the basis of this Amended Complaint occurred in this judicial district.

18.    The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.    Relators

19.    Paul Terrion is an experienced law enforcement officer based in Brook Park, Ohio. For the past twenty-five years, he has served as an Ohio State Highway Patrol Trooper.

20.    Throughout his tenure as a law enforcement officer, Trooper Terrion has been required to wear body armor while on duty.  Trooper Terrion has worn several different styles of body armor from several different manufacturers, including Point Blank.  Trooper Terrion formerly wore a Point Blank vest that suffered the type of catastrophic shoulder strap failure

8

described in this Complaint. Based on his extensive firsthand experience with body armor, Trooper Terrion has developed substantial expertise regarding the appropriate design of body armor shoulder straps, as well as the defects in the vests complained of in this action.

21.    Jody Eberhart is an active sworn police officer in the Ebensburg Police Department in Pennsylvania and a member of the U.S. Army Reserve. Since 2016, Mr. Eberhart has served as the Business Development Manager for the National Sheriffs' Association, where his responsibilities include assisting in the oversight of operations and procurement for over 3,000 sheriffs' offices and 2,400 jails nationwide. Mr. Eberhart has over a decade of experience in designing, testing, wearing, selling, and procuring body armor. Based on his extensive firsthand experience with body armor, Mr. Eberhart has developed substantial expertise regarding the appropriate design of body armor shoulder straps, as well as the defects in the vests complained of in this action.

22.    Relators are an original source of the allegations in this Complaint, and the allegations are not based upon publicly disclosed information. Relators voluntarily provided the Government with the information upon which the allegations in this Complaint are based prior to the filing of the Complaint in accordance with 31 U.S.C. § 3730(b)(2).

**B.    Defendants**

**1.    Point Blank Enterprises, Inc.**

23.    Point Blank Enterprises, Inc. ("PBE") is a corporation incorporated under the laws of the state of Florida, with its principal place of business at 2102 SW 2nd Street, Pompano Beach, Florida 33069. Although PBE has operated under different names at various time, PBE advertises that it has been developing, manufacturing, marketing and distributing body armor "since 1973." PBE is the largest supplier of ballistic and soft armor products for the U.S. military and law

9

enforcement.  PBE has a body armor market share of approximately fifty percent among domestic law enforcement agencies.

24.    At all times relevant herein, PBE has engaged in the business of manufacturing, marketing, warranting, distributing, and selling the SSBS vests at issue in this ligation through wholly-owned subsidiaries and/or brand names, including Point Blank Body Armor, Inc. ("PBBA"), Protective Apparel Corporation of America ("PACA"), Paraclete, Protective Products Enterprises ("PPE"), Advanced Technology Group, SOB Defense Systems, and Protective Apparel (formerly Short Bark Industries).  Throughout this complaint, "PBE" is used to describe both Point Blank Enterprises, Inc. and these subsidiaries and/or brand names.

### 2.    JLL Partners, LLC

25.    JLL Partners, LLC ("JLL") is a Delaware corporation with a principal place of business at 245 Park Avenue, Suite 1601, New York, NY 10167.  JLL is a private equity firm that has invested approximately $5.3 billion since its founding in 1988.

26.    In 2015, JLL acquired a controlling interest in PBE.  JLL is involved in the day-to-day management of PBE, with an emphasis on cutting costs and increasing profits.

### 3.    Sun Capital Partners, Inc.

27.    Sun Capital Partners, Inc. ("Sun Capital") is a Florida corporation with a principal place of business at 5200 Town Center Circle, 4th Floor, Boca Raton, FL 33486.  Sun Capital is a private equity firm that has invested in more than 375 companies worldwide with revenues of approximately $50 billion.

28.    In approximately 2011 or 2012, Sun Capital acquired a controlling interest in PBE. At least until the 2015 sale of PBE to JLL, Sun Capital was involved in the day-to-day management of PBE, with an emphasis on cutting costs and increasing profits.

### 4. Rival Technologies, LLC

29.     Rival Technologies, LLC ("Rival") is a Maryland corporation with a principal place of business at 2222 W. Parkside Lane #121, Phoenix, AZ 85027.  Rival manufactures textiles in the United States, Vietnam, China, and Taiwan.

30.     Rival engineered (or assisted in engineering), manufactured, and continues to manufacture the defective c-clamp fasteners at issue in this case.

### 5. Galls, LLC

31.     Galls, LLC ("Galls") is a Delaware corporation with a principal place of business at 1340 Russell Cave Road, Lexington, KY 40505.  Galls is among the nation's largest suppliers of equipment to law enforcement, military personnel, and first responders.

32.     Since at least 2001, Galls has sold vests manufactured by PBE and its predecessors, as well as the brands now owned by PBE that were once independent companies.  For approximately ten years, Galls has sold many of the SSBS vests identified in this Complaint.  In addition, Galls sells PBE-designed SSBS vests that are re-branded as "Galls" vests.

### 6. John Does Nos. 1-50, Fictitious Names

33.     John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme described herein.

34.     To the extent that any of the conduct or activities described in this Amended Complaint was not performed by Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50,

Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme described herein.

35. As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States, the Whistleblower States, and the Whistleblower Localities have suffered financial harm.

## IV. BACKGROUND

### A. The False Claims Act

36. The federal False Claims Act ("FCA") and its state and local counterparts prohibit "knowingly" presenting or causing to be presented to the government any false or fraudulent claim for payment or approval.[4]

37. The FCA and its state and local counterparts prohibit "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.[5]

38. The FCA and its state and local counterparts further impose liability upon any person who conspires to commit a violation of the FCA.[6]

39. The FCA and its state and local counterparts define a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient.[7]

40. Requesting payment for goods that are defective, of lesser quality than those for which the government contracted, or do not meet the specifications or requirements of the contract

---

[4] 31 U.S.C. § 3729(a)(1)(A).

[5] *Id.* § 3729(a)(1)(B).

[6] *Id.* § 3729(a)(1)(C).

[7] *Id.* § 3729(b)(2)(A).

constitutes a false claim under the FCA and its state and local counterparts. When Congress first enacted the FCA in 1863, defective products—which wasted taxpayer money and "endangered 'military operations'"—were among its primary concerns.[8]  Indeed, "[t]he original FCA was designed to combat defense procurement fraud."[9]  As Senator Henry Wilson stated when he introduced the bill:

> We have all of us seen enough . . . of frauds perpetrated upon the Government, and above all, and more than all, perpetrated upon our soldiers in the field; and I trust that the Senate will pass this bill . . . that will put fraudulent contractors in a position where they may be punished for their frauds.[10]

41.     When Congress amended the FCA in 1986, it expressed similar concerns, "noting that defective military products cause 'not only a serious threat to human life, but also to national security.'"[11]

## B.    Body Armor Purchase Process

42.     Body armor is worn by military personnel and law enforcement officers throughout the world.  In addition, many first responders, including firefighters and EMS personnel, wear body armor because they are often dispatched to respond to shootings.  The price of a bulletproof vest typically ranges from about $700 to $1,000.

43.     Those who wear body armor typically do so under a "mandatory wear" policy; that is, their employer requires them to wear body armor while on duty.

---

[8] Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* 169 (2d ed. 2010) (quoting Cong. Globe, 37th Cong., 3d Sess. 955 (1863) (statement of Sen. Howard)).

[9] James B. Helmer, Jr., *False Claims Act: Whistleblower Litigation* 59 (7th ed. 2017).

[10] *Id.* at 61 (quoting Cong. Globe, 37th Cong., 3d Sess. 348 (1863)).

[11] Sylvia, *supra* note 8 at 170 (quoting S. Rep. No. 99-345, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

13

44.    Body armor is generally acquired through one of two methods: either the wearer himself or herself will purchase body armor directly from a manufacturer or distributor, or a government agency (through a quartermaster or purchasing agent) will purchase body armor for use by its employees.  In the former case, the employee is typically given a stipend funded by the government with which to purchase the armor or is reimbursed for the purchase by his or her employer.

45.    PBE sells most vests through a layered process; it issues vests to distributors, who then handle fitting and sizing in a process similar to seeing a tailor and being fitted for a suit.  The distributor then sends the customer's sizing information to PBE, which manufactures the vest to the customer's specifications and ships the vest directly to the customer or to a retail store, depending on the preference of the customer.

46.    Body armor is not a one size fits all product.  To ensure a proper fit, manufacturers, including PBE, produce multiple sizes of body armor and will even produce made-to-measure armor that conforms to the individual wearer.  Accordingly, body armor is not fungible; if a wearer's vest fails, he or she usually cannot simply don another vest, as even subtle differences in sizing can prevent a vest from fitting properly.  In addition, even if it were possible to substitute any given failed vest for a new one, the high cost of body armor typically means that government agencies lack the resources to purchase spare vests in the first place.

47.    Body armor—more specifically, the ballistic material inside body armor—is available in different levels of protection.  These ballistic levels are defined by the National

14

Institute of Justice ("NIJ"), and arm of the U.S. Department of Justice ("DOJ") that is responsible for certifying and approving the ballistic capability of every body armor design.[12]

48.      Ballistic levels range from a low of IIA to a high of IV.  However, the SSBS vests at issue in this case fall into only three levels: IIA (the lowest level of protection, designed to stop smaller rounds of ammunition fired at slower speeds), II (an intermediate level of protection, designed to stop larger rounds of ammunition fired at higher speeds) and IIIA (the highest level of protection, designed to stop even larger and faster rounds of ammunition).

49.      In the vast majority of instances in which a police officer is shot, he or she is shot with his or her own sidearm (which the assailant has taken).  Accordingly, police departments typically require their officers to wear body armor corresponding to the NIJ ballistic level that will provide protection from whatever sidearm the officers are issued.  Most police departments require officers to wear armor at the II or IIIA levels.

### 1.      U.S. Military and Federal Government Purchases

50.      The General Services Administration (GSA) is an agency of the federal government with responsibility for administering the Multiple Award Schedule (MAS) contracting program.

51.      Under the MAS program, GSA negotiates contracts for commonly used commercial items with contractors.  Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices, terms, and conditions.  Products are grouped under predesignated Special Item Numbers (SINs) which connote broad categories of commercial products or services.

---

[12] The NIJ does not test or certify the effectiveness or durability of body armor strap systems such as the SSBS at issue in this case.

52.     The GSA Schedule includes, and has long included, vests manufactured and sold by PBE.  In addition, federal government agencies sometimes purchase bulletproof vests directly from a manufacturer or distributor, apart from the GSA Schedule.

53.     Federal government agencies purchase thousands of vests annually.  For approximately ten years, the federal government has purchased tens of thousands of defective SSBS vests at a cost of tens of millions of dollars.

### 2.     State and Local Law Enforcement Purchases

54.     Between 1985 and 1994, 709 law enforcement officers in the United States were feloniously killed in the line of duty.[13]  During the same period, bullet-resistant materials helped save the lives of over 2,000 law enforcement officers in the United States.[14]  Nevertheless, by 1998, 25 percent of state, local, and tribal law enforcement officers were not issued body armor.[15]

55.     To close this gap, Congress created a grant program called the Bulletproof Vest Grant Partnership Act (BVP), currently codified at 34 U.S.C. §§ 10530-34.  The BVP grant program is administered by the Bureau of Justice Assistance, a division of the DOJ.

56.     Under the BVP grant program, the United States reimburses state, local, and tribal authorities up to fifty percent of the cost of ballistic vests.[16]  The exact amount state, local, and tribal law enforcement agencies are reimbursed for a specific vest varies based on the entitlement cap for each such agency for that fiscal year.

57.     Purchasers under the BVP grant program include state, local, and tribal law

---

[13] Bulletproof Vest Partnership Grant Act of 1998, Pub. L. 105-181, § 2(a)(2), 112 Stat. 512, 512 (1998).

[14] *Id.* § 2(a)(5).

[15] *Id.* § 2(a)(4).

[16] 34 U.S.C. § 10531(f)(1).

enforcement agencies. These purchasers make claims for reimbursement to the federal government after receiving their vests. Law enforcement agencies may be reimbursed only for vests replaced on a 5-year basis. As of January 2019, the BVP program had awarded approximately $467 million to over 13,000 jurisdictions for the purchase of over 1 million vests.[17]

58. Each state enters into contracts with body armor manufacturers to establish a negotiated price list for various models of body armor, often including volume-based discounts. Twenty-six states are members of the National Association of State Procurement Officials ("NASPO"), which negotiates a master price agreement that can be modified to fit each state's particular needs.[18] Localities and law enforcement agencies sometimes negotiate their own price lists with manufacturers, sometimes pool their resources with other agencies to take advantage of their shared purchasing power, and sometimes simply purchase body armor at retail prices.

59. State and local government agencies purchase thousands of vests annually. For approximately ten years, state and local government agencies have purchased tens of thousands of defective SSBS vests at a cost of tens of millions of dollars. A significant portion of these purchases has been subsidized by the federal government through the BVP grant program.

## V.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Industry Standards and Ordinary Use

60. Body armor comprises two primary components: ballistic panels, which provide stopping power for projectiles, and carriers, which hold the panels in place and are worn on the body.

---

[17] *Bulletproof Vest Partnership*, Office of Justice Programs, https://ojp.gov/bvpbasi/ (last visited Nov. 15, 2019).

[18] For example, if a state requires certain body armor attachments or accessories, it will negotiate a separate price list to reflect those additions.

61.     Body armor is manufactured in these two separate components so the carrier—which accumulates grime and sweat, and tends to wear out faster than the ballistic panels—can be washed or even replaced during the life of the ballistic panels.  Regardless of the type of vest, ballistic panels are typically warrantied for five years.  Carriers are typically warrantied for two years.

62.     In a typical vest design, the carrier is split into two parts: front and back.  Robust, Velcro-brand hook fasteners are attached to both ends of the shoulder straps, with a large piece of corresponding loop fastener on the panel itself.  The large size of the loop fasteners permits the wearer to adjust the effective length of the shoulder straps, and the large size of the hook fasteners ensures strong adherence between the strap and the carrier.  Ballistic panels are inserted into both the front and back pieces of the carrier.  Similar Velcro hook-and-loop straps secure the sides of the vest, ensuring a snug fit on the wearer.

63.     The industry standard for body armor design is exemplified by the following photos of a vest manufactured by Safariland, a competitor of PBE:



**B.**     **Defendants' SSBS Vests**

64.     Beginning in approximately 2004, PBE developed its new SSBS shoulder strap technology that differentiated from the industry standard design.  Instead of affixing to the carrier, the shoulder straps in an SSBS vest affix to the ballistic panels themselves by attaching to four c-clamp fasteners—one at each shoulder of both the front and back ballistic panels.

65.     According to PBE, the SSBS design permits the ballistic panels to remain independently suspended within the carrier, preventing the panels from sliding around or rolling. PBE's marketing materials advertise that the "peel-back shoulder design" of the SSBS fasteners allows for "easy donning and doffing" of the vest.

66.     The following artist's rendering depicts the internal workings of the SSBS.  The c-clamp fastener (called a "gator mouth" by PBE), which contains a hook-like material, is sewn to the ballistic panel, rather than the strap.  The strap, which is made of a fabric that has some gripping properties, is designed to adhere to the c-clamp fastener.  The carrier fits around the strap and does not adhere to the straps or the ballistic panels:



19

67.     Although the initial SSBS design diverged from industry standards, it did not contain the defects identified in this Complaint.  The shoulder straps of the original SSBS vest design contained genuine loop Velcro, which attached to genuine hook Velcro in a large, clamshell-style fastener at each end of the strap, sewn into the top of the ballistic panel:



68.     These fasteners measured approximately two inches by two inches, providing approximately eight square inches of coverage at either end of the shoulder strap.  Additionally, both ends of the carrier contained additional patches of genuine Velcro hook material, providing additional gripping strength and serving as a failsafe in case the clamshell-style fastening system failed or came loose:

 

69.     The robustness of this shoulder strap design came at a price.  Genuine Velcro costs more than its generic counterparts (and considerably more than knit shirt-like fabric and neoprene), though it has better gripping power.  A woven hook fastener costs more than a laminated hook fastener, though it is more durable and not prone to warp.  Sewing genuine loop Velcro onto each shoulder strap means that each strap must be long enough to fit a variety of body sizes, with a correspondingly large piece of hook material to allow for length adjustments, though such a system is more durable than a neoprene strap that can be cut to fit by the wearer.

70.     PBE identified each of these tradeoffs between quality and price, and prioritized the latter in every circumstance.  In cutting costs everywhere it could, PBE has endangered the lives of everyone who wears its SSBS vests.

71.     In approximately 2009, PBE radically changed the design of the shoulder strap system.  PBE replaced all of the genuine Velcro in the shoulder strap system with a generic hook-and-loop fastener system manufactured overseas.  It then replaced the shoulder strap with a piece of fabric composed of a neoprene core glued to two strips of knit shirt-like fabric:



72.    The following photo depicts the original strap design (top) with the current strap design (bottom):



73.    PBE claims that the new strap is more convenient because it can be cut to fit by the wearer. However, as explained below, the ends of the straps tend to fray, often requiring the wearer to cut off a portion of the strap to access new fabric. This causes the vest to have a suboptimal fit.

74.    Although the knit shirt-like fabric in the current SSBS vest design has some adherent properties when paired with a hook fastener, it is not designed for use with a hook fastener, especially when considering the weight of a bulletproof vest. A close comparison between genuine Velcro loop material (left) and the knit shirt-like fabric used in the SSBS vests (right) reveals obvious dissimilarities, even to the naked eye:



75.    PBE further removed the secondary Velcro fasteners on the carrier, leaving only one point of adhesion on either end of each shoulder strap.  It replaced the large, clamshell-style fasteners with c-clamps less than half the size, containing a laminated generic hook material:



76.    This single connection is inadequate to support the weight of the vest over its life. In addition to the inherent weakness of the connection between each small c-clamp fastener and the shirt-like fabric strap, the strap and fastener have additional latent defects that reduce their

lifespan and lead to catastrophic failure.  The shirt-like fabric material, which is not designed to replace a loop material in a hook-and-loop system, rapidly frays with ordinary use, reducing its already weak grip strength.  The following photo depicts one of the straps of Trooper Terrion's vest, which is visibly frayed after only two years of use, with removal about twice a month:



77.     As for the c-clamp fastener, moisture and heat cause the lamination to warp outwards, away from the strap, preventing it from fastening properly to the strap.  The following photo depicts one of the fasteners on Trooper Terrion's vest, which naturally and spontaneously warps outward, and has been rendered almost entirely useless after only two years of ordinary use:



C.    **Laboratory Test Data Confirm the SSBS Vests Are Defective**

78.    The failures in Trooper Terrion's vest are emblematic of the defects present in every SSBS vest.  Laboratory test data from Clemson University's Department of Materials Science and Engineering confirm that the SSBS will not properly perform and maintain its integrity for the entirety of its warranty period.  These laboratory test data demonstrate that if a new SSBS vest is cycled (donned and doffed) under normal conditions of use by disconnecting the SSBS closure (regardless of whether by shearing or peeling), the strapping system weakens to a point where the closure lacks sufficient strength to securely support the weight of the vest when on an officer.

79.    The laboratory test data demonstrate a substantial drop-off in shear strength,[19] with the straps losing 85% of initial shear strength over just 100 shear tests (approximately 5 months of donning and doffing only once per day, five days a week).  Given that SSBS vests weigh approximately 5 pounds, after approximately 75 shear tests, the closure will not support the weight of the vest and will not keep it from falling down at the connection point.

80.    Similarly, the laboratory data demonstrate a substantial drop-off in peel strength,[20] with the straps losing approximately 50% of peel strength over just 50 peel tests per side of the SSBS closure system (approximately 2.5 months of donning and doffing by disconnecting the SSBS once per day, five days a week).

81.    Furthermore, the test data demonstrate that the SSBS will prematurely deteriorate and is prone to fail within the warranty period even if the SSBS closure is disengaged and engaged only occasionally so that the carrier can be removed and laundered.  Put differently, the normal daily tension placed on the SSBS closure will cause the vest to fail within the warranty period.

---

[19] Shear strength is the strength of a material against shear load: a force that produces a sliding failure on a material along a plane that is parallel to the direction of the force.

[20] Peel strength is the strength of an adhesive bond between two materials.

82.     These defects are exacerbated by the presence of moisture—a particularly problematic result, considering the extremely high likelihood that the wearer of a vest will perspire throughout the day or encounter precipitation on any given day.  In particular, the knit shirt-like fabric strap rapidly loses its ability to adhere to the laminated c-clamp fastener after being cycled when wet.

83.     The laboratory data starkly contrast with PBE's advertisements, representations, and warranties as to the performance capability of the SSBS vests—that purchasers should be able to cycle the SSBS connection twice daily for easy "doffing and donning" for five years.

84.     One of the mechanisms of the failure is shown by the following microphotographs. Upon repeated cycling of the SSBS connections, the plastic-like hook material in the SSBS clamps breaks apart one end of fibers from the strap (far from being robust, there is only a very thin layer of loop-like fiber on an SSBS strap).  Thus, the loop-like fiber is unable to engage the hook and connect the strap to the fastener.  As shown below, the used strap material (right) is in far worse condition than the new strap material (left).  The used strap material is broken apart and straightened, unable to engage with a hook fastener:



### D.    PBE's Defective Vests Pose an Extreme Safety Hazard

85.    SSBS vests are prone to fail well before the expiration of their five-year warranty period.  When a vest fails, it can fall down inside a wearer's uniform (in the case of concealable vests) or hang loose outside the uniform (in the case of external vests).  In either case, the failure of the SSBS shoulder straps to support the vest adequately poses an extreme safety hazard to the wearer, who is left unprotected.

86.    For example, Ohio State Trooper Trevor Koontz, whose vest fell apart while he was on foot patrol at the 2016 Republican National Convention in Cleveland, explained the defects this way:

> [T]here's a cancer in this vest. . . .  I was living my . . . day-to-day life with . . . metaphorically, a medical condition built into this vest, manufactured in this vest from Point Blank.  It came out.  It could have cost me my life.

87.    When an SSBS vest fails, the wearer, who is in extreme danger, must retreat to an area of relative safety and attempt to re-adhere the shoulder straps.  The majority of purchasers experiencing failures of the SSBS are forced to turn to self-help methods, including duct tape, electrical tape, safety pins, and other methods to hold their vests together and address the safety hazard from the SSBS failure.  The following photos depict a few examples:

 



88.    A vest cannot protect an officer's life if it cannot be properly worn.

89.    Fully acknowledging the safety hazard presented by a SSBS that does not work properly and unexpectedly fails in the line of duty, PBE represents to all purchasers in the Care and Maintenance Manual that if the panels do "not stay in position" they must be replaced.

90.    Here, the ballistic panels do not stay in "proper position" because the SSBS vests suffer from defects in manufacturing, material, workmanship, and design, resulting in the SSBS prematurely failing.

91.    Compounding the problem, there is no method to repair a failed SSBS without returning the vest to PBE's manufacturing facility.

92.    Equally problematic, and demonstrating the futility of attempted repairs, PBE's standard repair time is between two weeks and one month.  However, the overwhelming majority of law enforcement agencies in the United States (and all agencies that accept federal funds) have a mandatory wear policy and thus, officers may not go on a single shift without their vests, let alone wait two to four weeks.  In addition, the overwhelming majority of law enforcement agencies in the United States does not have sufficient funding to purchase backup vests for use during this repair period.  Furthermore, even in large law enforcement agencies that have extra vests, a wearer likely will be unable to find a vest that fits an officer properly.  Therefore, returning a defective

SSBS vest to PBE for repair is not a realistic option, forcing users to rely on the self-help measures described above.

### E.    The SSBS Is Uniformly Defective in Manufacture, Materials, Workmanship, and Design

93.    PBE tightly controls all aspects of the design, manufacture, marketing, distribution, and labeling of its body armor, including its SSBS vests.

94.    At all relevant times, SSBS vests have been sold directly by PBE or through PBE sales representatives and authorized distributors, which PBE refers to as "Point Blank's global distribution network."

95.    All SSBS vests, regardless of the make, model, or threat level, include the same SSBS described herein and suffer from the same latent defects.

96.    At all relevant times, PBE has manufactured and sold four models of concealable SSBS vests under its PBBA brand: the Standard, Hi-Lite, Vision, and Elite, and three models of concealable SSBS vests under the PACA brand name: the Standard, Perform-X, and Blue Steel.[21]

97.    In addition, at all relevant times, PBE has manufactured and sold tactical, correctional, and crossover vests (all of which are worn outside the clothing), including the Laser ODC,[22] Tank Track Laser ODC, Maverick ODC, Endeavor ODC, Standard ODC, Uniform ODC, Admin ODC, and International GEN II Slick.  All of these vests are designed to be paired with SSBS panels and all of these vests suffer from the same defects identified in the concealable SSBS vests.

---

[21] The Hi-Lite and Perform-X vests are identical except for branding, as are the Vision and Blue Steel vests and the PBE Standard and PACA Standard vests.  Thus, PBE actually sells only four types of concealable vests.

[22] ODC stands for "outer duty carrier," a type of body armor that is worn outside of the clothing and typically contains pouches and compartments for equipment.

98.    Furthermore, Galls sells concealable SSBS vests under the GL, SE, and G-Force brand names.  These vests are identical to PBE's concealable SSBS vests except for branding.

99.    Regardless of the model, the SSBS in all SSBS vests is identical or substantially identical, suffers from the same defects, and is subject to the same warranties, misrepresentations, and omissions.

**F.    PBE Actively Concealed the Defects in the SSBS Vests**

100.    PBE supplies five-year written warranties covering the SSBS and ballistic panel system, and a separate two-year written warranty for the carriers of its SSBS vests.

101.    At all relevant times, Defendants' marketing materials uniformly warrant for all SSBS vests that the SSBS should last "throughout the life of the Vest."

102.    PBE broadly disseminated its uniform marketing materials throughout the United States, including but not limited to, through press releases (typically through PRNewswire), through law enforcement publications, through its website, and through an extensive distributor network, which in turn have additional prolific online presence and distribute print materials in retail law enforcement supply stores.

103.    PBE further represented and advertised in its marketing materials, on its website, and in news articles (including, for example, in the January 2014 edition of "Law and Order" magazine published throughout the United States) that disconnecting the SSBS to don and doff the vests was not only normal and appropriate, but that doing so was a preferred and "easy" method of donning and doffing its SSBS Vests and that officers—particularly women—often disconnect "one of the shoulder straps and remove the armor and carrier like a buttoned shirt - yes, to avoid dragging the armor over their face and hair."

30

104. At all relevant time periods, PBE has posted a training video on its website demonstrating that the normal and appropriate method to disconnect the SSBS is by pulling or shearing, or a combination of pulling/shearing and peeling the SSBS connection apart.

105. Despite those representations and advertisements, and unbeknownst to any purchasers, internally, PBE's management has known prior to the sale of all SSBS vests at issue in this Complaint that the vests are not robust enough for regular cycling of the SSBS shoulder straps.

106. Throughout all relevant times hereto, PBE has known that regular cycling of an SSBS vest will cause severe and rapid deterioration and failure of the SSBS. PBE has actively concealed that information from federal, state, and local government purchasers.

107. PBE has never warned any purchasers not to disconnect the SSBS connectors (by shearing, peeling, or otherwise), or that doing so would cause accelerated and severe deterioration of the SSBS and its resulting unexpected, premature failure.

108. All SSBS vests are defective and the defects exist from the time the vests leave the manufacturing line, in that the SSBS will fail while officers don and doff their SSBS vests, and/or during and from normal use over time even if the SSBS is not cycled daily (*i.e.*, even if purchasers do not don and doff their vests by disconnecting the SSBS).

109. Each time the SSBS connection is cycled as designed and recommended by PBE, the SSBS deteriorates and weakens to the point where it does not have sufficient strength to securely support the weight of the vest when on an officer, and the vest falls apart. Repeated disengagement of the SSBS straps from the c-clamps, whether by peeling or shearing, rapidly accelerates the weakening of the SSBS closure, as does the introduction of moisture (*e.g.*, sweat or rain).

31

110. Constant tension and pulling on the SSBS also results in failure, even where the SSBS is infrequently cycled, for example, occasionally to remove and clean the outer carrier of the vest (which requires disconnecting the SSBS).

111. Substandard stitching of the c-clamps to the ballistic panels also causes a system failure of the SSBS as rapidly as within a few months.

112. Prior to the sale of all SSBS vests identified in this Complaint, PBE had extensive knowledge of the vests' defects from its own studies and surveys and from its own research and design personnel. Following the initial sale of the SSBS vests identified in this Complaint, PBE gained further knowledge of these defects from the severity and consistency of the problems reported from its field representatives and from consistent complaints from purchasers (including repeat complaints from purchasers).

113. PBE has received, but concealed, extensive and alarming complaints from law enforcement personnel spanning the entire country. PBE has received multiple complaints on a monthly basis which expressly informed PBE of the defects identified in this Complaint and notified PBE that users were concerned for their safety, that the failures continue to occur in the line of duty and as soon as within a year, and that replacement straps do not correct the problem. Examples of these complaints from law enforcement officers in California, Missouri, Nevada, New Jersey, New York, and West Virginia are reproduced below:

- August 4, 2017: "Hello, this is the second time I've tried contacting someone there. I am a State Trooper with the Nevada Highway Patrol. I currently wear the Point Blank Vision [v]est and have about four years. I have been having problems with the shoulder Velcro straps not sticking, causing the vest to literally fall apart while wearing it during my shift, causing not only discomfort in the field but an unsafe situation with the vest falling down. It also takes me extra time before shift to try to get the strap to stick as it will fall apart as I don it, so I have to don it very carefully and not put weight on it. . . . I'm stuck in a tough situation now because my department will only purchase a new vest every

five years and I can't afford to pay out of pocket, but this vest is unsafe to use as is. . . ."

- September 12, 2017: "I am a police officer with the La Mesa [San Diego County] Police Department. . . .  [I've had a] new point blank vest for less then [*sic*] 2 years and the Velcro straps are already not working.  The Velcro straps are folded up, don't stick to the vest and are becoming unusable."

- September 16, 2017: "About a year ago I made contact with someone with your company about shoulder straps not holding and had the Velcro replaced, I believe that the same issue is happening again, wondering what I could do?"

- September 19, 2017: "I have an issue regarding the Velcro straps on my vest. The 'clam shell' design that holds the straps in place seem to have failed completely.  I have been forced to use duct tape and safety pins to keep it held together.  I would like to have this fixed and did not want to take it to an outside source due to the fact that Velcro is attached directly to the vest."

- November 12, 2017: "I have an Elite vest I purchased about two years ago or more. . . . The Velcro on both panels are failing and the ballistic panel is tearing the corners of the vest carrier.  I spent over $1100.00 on this set up and I don't I should be seeing these problems so soon."

- December 5, 2017: "Hi my names [*sic*] is Katherine.  I am an officer for the NYPD and was issued a vest.  However. I have under a year with the vest and already the Velcro straps have broken."

114.    PBE has knowingly manufactured and sold defective SSBS vests while willfully concealing the true inferior quality, sub-standard performance, and other defects causing failure of the SSBS.

115.    Defendants failed to inform any purchasers of the defects prior to their purchase of SSBS vests.

116.    Beginning in January 2018, PBE published knowingly false and deceptive information as to the performance and effectiveness of the SSBS.  The published information deceives purchasers and affirmatively conceals the known latent defects in the SSBS vests for the purpose of maintaining existing sales and inducing continued sales of the vests.  For example:

33

(a)     PBE knowingly and falsely stated that it "rigorously" tested the SSBS when in fact it had not.

(b)     PBE falsely represented that a consultant "confirms that Point Blank's SSBS vests are durable, safe, and comply with Point Blank's representations and warranties," when in fact the consultant had not and had never even seen a SSBS vest in person.

(c)     PBE falsely represented that the consultant confirmed that the SSBS "straps simply will not detach from the bird's mouth even after extensive use and aging" when in fact the consultant had not.

(d)     PBE's representations were based on supposedly rigorous and proper testing, which in fact was not true.  The limited testing that was performed involved SSBS components, as opposed to SSBS vests.  Furthermore, the SSBS components that were tested were not the knockoff Chinese materials currently being used in PBE's SSBS vests; rather, PBE's representations were based on testing of real Velcro and Breathe-O-Prene SSBS components that are not actually used in PBE's SSBS vests.

117.    The information PBE concealed about the SSBS and the information it affirmatively misrepresented about the SSBS were substantial factors in influencing the decisions of government agencies and individual law enforcement officers and first responders to purchase SSBS vests.  Indeed, Nikki Pollack, the State Procurement Administrator for Colorado (the lead state for the NASPO Master Contract for body armor), recently testified after reviewing just a small fraction of the concealed documents: "If I was aware of the problem, I certainly wouldn't continue to buy the product."  She additionally testified:

34

[Q.] Do you believe that you were kept in the dark – on a fair amount of information that would have been material to you?

[A.] Based on what I've seen today and the information that I've received regarding the vests and the lawsuit, there's a significant amount that I was not provided with, yes.

\* \* \*

[Q.] Do you believe that law enforcement officers should be entitled to see and review the information that you've seen today and earlier this morning when making a decision on purchasing a life-critical product?

[A.] If I were an officer, I'd want to see it, yes.

\* \* \*

[Q.] And as a person making a decision on whether to authorize certain models of vests to be on a list to be sold in your state and potentially others, you would have wanted to see all of this information beforehand; is that fair?

[A.] I would want to provide all the information that is available on the product to the customer and let them make an informed decision about whether or not they want to purchase the vest.

118. To this day, PBE continues to deliberately and proactively conceal the true characteristics, performance, qualities, limitations, known defects, and failures of the SSBS from all purchasers and users of SSBS vests.

## VI.    CAUSES OF ACTION

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

119.    Relators incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

120.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the United States of America false or fraudulent claims for payment for defective SSBS vests, in violation of 31 U.S.C. § 3729(a)(1)(A).

121.    Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

### COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

122.    Relators incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

123.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

124.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

36

125.    Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))

126.    Relators incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

127.    PBE and John Does Nos. 1-50, Fictitious Names knowingly conspired, and are still conspiring, to commit acts in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B).   Defendants committed overt acts in furtherance of the conspiracy as described above.

128.    Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

## COUNT IV
### (Violation of California False Claims Act)

129.    Relators incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

130.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

131.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

132.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

133.    Because of Defendants' actions, the State of California, including its political subdivisions, has been and continues to be severely damaged.

## COUNT V
## (Violation of Delaware False Claims and Reporting Act)

134.    Relators incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

135.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

136.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

137.    The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

138.    Because of Defendants' actions, the State of Delaware and/or its political subdivisions have been and continue to be severely damaged.

38

## COUNT VI
### (Violation of District of Columbia False Claims Act)

139.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

140.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

141.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and are still making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

142.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

143.    Because of Defendants' actions, the District of Columbia and/or its political subdivisions have been and continue to be severely damaged.

## COUNT VII
### (Violation of Florida False Claims Act)

144.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

145.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Florida, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

146. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(b).

147. The State of Florida, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

148. Because of Defendants' actions, the State of Florida and/or its political subdivisions have been and continue to be severely damaged.

### COUNT VIII
### (Violation of Hawaii False Claims Act)

149. Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

150. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

151. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made and used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

152. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

153. Because of Defendants' actions, the State of Hawaii and/or its political subdivisions have been and continue to be severely damaged.

## COUNT IX
### (Violation of Illinois False Claims Act)

154. Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

155. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

156. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

157. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid and continue to pay for defective SSBS vests.

41

158. Because of Defendants' actions, the State of Illinois and/or its political subdivisions have been and continue to be severely damaged.

## COUNT X
### (Violation of Indiana Medicaid False Claims and Whistleblower Protection Act)

159. Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

160. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and are still presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

161. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

162. The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid and continue to pay for defective SSBS vests.

163. Because of Defendants' actions, the State of Indiana and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XI
### (Violation of Iowa False Claims Act)

164. Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

165.    Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

166.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

167.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

168.    Because of Defendants' actions, the State of Iowa and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XII
### (Violation of Massachusetts False Claims Act)

169.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

170.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

171.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

43

made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

172.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

173.    Because of Defendants' actions, the Commonwealth of Massachusetts and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIII
### (Violation of Minnesota False Claims Act)

174.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

175.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

176.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

44

177.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

178.    Because of Defendants' actions, the State of Minnesota and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIV
### (Violation of Montana False Claims Act)

179.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

180.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

181.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

182.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

183.    Because of Defendants' actions, the State of Montana and/or its political subdivisions have been and continue to be severely damaged.

45

## COUNT XV
### (Violation of Nevada False Claims Act)

184.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

185.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

186.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

187.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

188.    Because of Defendants' actions, the State of Nevada and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVI
### (Violation of New Jersey False Claims Act)

189.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

190.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting or causing to be

presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

191.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

192.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

193.    Because of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVII
### (Violation of New Mexico Fraud Against Taxpayers Act)

194.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

195.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.M. Stat. Ann. § 44-9-3(A)(1).

196.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

47

made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment for or approval of a false or fraudulent claim by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 44-9-3(A)(2).

197.    The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

198.    Because of Defendants' actions, as set forth above, the State of New Mexico and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVIII
### (Violation of New York False Claim Act)

199.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

200.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

201.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

48

202.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

203.    Because of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIX
### (Violation of North Carolina False Claims Act)

204.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

205.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

206.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

207.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

208.    Because of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been and continue to be severely damaged.

49

## COUNT XX
### (Violation of Oklahoma Medicaid False Claims Act)

209.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

210.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

211.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

212.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

213.    Because of Defendants' actions, the State of Oklahoma and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXI
### (Violation of Rhode Island False Claims Act)

214.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

215.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

216.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and are still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

217.    The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

218.    Because of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been and continue to be severely damaged.

### COUNT XXII
### (Violation of Tennessee False Claims Act)

219.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

220.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Tenn. Code Ann. § 4-18-103(1).

221.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

51

made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 4-18-103(2).

222.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

223.    Because of Defendants' actions, the State of Tennessee and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXIII
### (Violation of Vermont False Claims Act)

224.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

225.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Vermont, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1).

226.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Tennessee, or its political subdivisions, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

227.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

228.    Because of Defendants' actions, the State of Vermont and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXIV
### (Violation of Virginia Fraud Against Taxpayers Act)

229.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

230.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

231.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

232.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

233.    Because of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXV
### (Violation of Puerto Rico False Claims Act)

234.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

235.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of 2018 P.R. Act 154 (H.B. 1627), § 3.07(A)(1).

236.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 2018 P.R. Act 154 (H.B. 1627), § 3.07(A)(2).

237.    The Commonwealth of Puerto Rico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

238.    Because of Defendants' actions, as set forth above, the Commonwealth of Puerto Rico and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXVI
### (Violation of Chicago False Claims Ordinance)

239.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

240. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Chicago City Government to approve and pay for defective SSBS vests.

241. The Chicago City Government, unaware of the falsity of the records, statements and, claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

242. By reason of the Defendants' unlawful acts, the City of Chicago has been severely damaged.

**COUNT XXVII**
**(Violation of Hallandale Beach False Claims Ordinance)**

243. Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

244. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hallandale Beach City Government to approve and pay for defective SSBS vests.

245. The Hallandale Beach City Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

246. By reason of the Defendants' unlawful acts, the City of Hallandale Beach has been severely damaged.

55

## COUNT XXVIII
**(Violation of Broward County False Claims Ordinance)**

247.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

248.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Broward County Government to approve and pay for defective SSBS vests.

249.    The Broward County Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

250.    By reason of the Defendants' unlawful acts, Broward County has been severely damaged.

## COUNT XXIX
**(Violation of Miami-Dade False Claims Ordinance)**

251.    Relators incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

252.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Miami-Dade County Government to approve and pay for defective SSBS vests.

253.    The Miami-Dade County Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

254. By reason of the Defendants' unlawful acts, Miami-Dade County has been severely damaged.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*;Haw. Rev. Stat. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 27-14-1 *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 4-18-101 *et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; 2018 P.R. Act 154 (H.B. 1627); Chicago Mun. Code §§ 1-21-010 *et seq.*; Hallandale Beach Code of Ordinances §§ 8-201 *et seq.*; Broward Cnty. Code of Ordinances §§ 1-276 *et seq.*; and Miami-Dade Cnty. Code §§ 21-255 *et seq.*;

B. That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[23] to the extent such multiplied penalties shall

---

[23] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a),[24] to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[24] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

E. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

59

H. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim,[25] as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions

---

[25] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.  That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B,[26] to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the

---

[26] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927)  per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c),[27] to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by

---

[27] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

62

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 44-9-3(C), multiplied as provided for in N.M. Stat. Ann. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. Ann. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.M. Stat. Ann. § 44-9-3(C)(3)-(4);

Q. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits

63

provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R. That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its agencies multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($01,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its agencies for losses resulting from the various schemes undertaken

by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Tennessee or its agencies multiplied as provided for in Tenn. Code Ann. § 4-18-103(a), plus a civil penalty of not less than two thousand five hundred dollars ($2,500) or more than ten thousand dollars ($10,000) per false claim, as provided by Tenn. Code Ann. § 4-18-103(a), to the extent such multiplied penalties shall fairly compensate the State of Tennessee or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631(b)(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(1), as well as the

65

costs incurred by the State of Vermont, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d),[28] as well as the costs incurred by Relator and the Commonwealth of Puerto Rico, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(3), in order to fairly compensate the Commonwealth of Puerto Rico or its political subdivisions for losses resulting from the various schemes undertaken by

---

[28] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the City of Chicago, multiplied as provided for in Chicago Mun. Code § 1-22-020, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Chicago Mun. Code § 1-22-020, as well as the costs incurred by Relator and the City of Chicago, as provided by Chicago Mun. Code § 1-22-020, in order to fairly compensate the City of Chicago for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the City of Hallandale Beach, multiplied as provided for in Hallandale Beach Code of Ordinances § 8-204(c)(1), plus civil penalties, as provided by Hallandale Beach Code of Ordinances § 8-204(c)(5), as well as the costs incurred by Relator and the City of Hallandale Beach, as provided by Hallandale Beach Code of Ordinances § 8-207(a), in order to fairly compensate the City of Hallandale Beach for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Broward County, multiplied as provided for in Broward Cnty. Code of Ordinances § 1-279(c)(1), as well as the costs incurred by Relator and Broward County, as provided by Broward Cnty. Code of Ordinances § 1-283(a)-(b), in order to fairly compensate Broward County for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Miami-Dade County, multiplied as provided for in Miami-Dade Cnty. Code § 21-258(3)(a), as well as the costs incurred by Relator and Broward County, as provided by Miami-Dade Cnty. Code §§ 21-258(3)(c), -262(1)-(2), in order to fairly compensate Miami-Dade County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC.  That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

DD.  That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit;

EE.  That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

FF.  That this Court award such further relief as it deems just and proper.

## JURY DEMAND

Relators hereby demand a trial by jury on all claims so triable in this action.

Dated:  November 27, 2019

**BARON & BUDD, P.C.**

By:  /s/ W. Scott Simmer

W. Scott Simmer, Bar No. 460726
ssimmer@baronbudd.com
Noah M. Rich (application for admission pending)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone:  202.333.7352
Facsimile:  202.337.1039

*Attorneys for Relators*