## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAUL TERRION and JODY EBERHART, and on behalf of the STATES of CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, IOWA, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, RHODE ISLAND, TENNESSEE, VERMONT, the Commonwealth of MASSACHUSETTS, the Commonwealth of VIRGINIA, the Commonwealth of PUERTO RICO, and the DISTRICT OF COLUMBIA, | Civil Action No. 1:19-cv-3581<br><br><br>**FIRST AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE & LOCAL COUNTERPARTS**<br><br><br>**JURY TRIAL DEMANDED** |
| *Plaintiffs/Relators*, | |
| v. | |
| POINT BLANK ENTERPRISES, INC. 2102 SW 2ⁿᵈ Street Pompano Beach, FL 33069, | |
| and | |
| JOHN DOES NOS. 1-50, FICTITIOUS NAMES, | |
| *Defendants*. | |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................2

II.    JURISDICTION AND VENUE .........................................................................6

III.   PARTIES ............................................................................................................7

    A.     Relators ....................................................................................................7

    B.     Defendants ..............................................................................................11

        1.     Point Blank Enterprises, Inc. .......................................................11

        2.     John Does Nos. 1-50, Fictitious Names.......................................12

IV.    BACKGROUND ...............................................................................................12

    A.     The False Claims Act..............................................................................12

    B.     Body Armor Purchase Process................................................................14

        1.     U.S. Military and Federal Government Purchases........................16

        2.     State and Local Law Enforcement Purchases .............................18

V.     DEFENDANTS' FRAUDULENT SCHEME ...................................................22

    A.     Industry Standards and Ordinary Use ....................................................22

    B.     Defendants' SSBS Vests & Departure from Ordinary Design ...............24

    C.     Laboratory Test Data Confirm the SSBS Vests Are Defective ..............30

    D.     PBE's Defective Vests Pose an Extreme Safety Hazard ........................32

    E.     The SSBS Is Uniformly Defective..........................................................34

    F.     PBE Fraudulently Represented That Its SSBS Vests Would Last for 5 Years......35

    G.     The Defects in PBE's SSBS Vests Are Material ....................................40

VI.    CAUSES OF ACTION ......................................................................................42

    COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ...........42

    COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ..........42

    COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))........43

    COUNT IV (Violation of California False Claims Act)....................................43

    COUNT V (Violation of Delaware False Claims and Reporting Act) ..............44

    COUNT VI (Violation of District of Columbia False Claims Act)..................45

    COUNT VII (Violation of Florida False Claims Act) ......................................46

    COUNT VIII (Violation of Hawaii False Claims Act)......................................46

    COUNT IX (Violation of Illinois False Claims Act).........................................47

    COUNT X (Violation of Indiana False Claims and Whistleblower Protection Act) ........48

COUNT XI (Violation of Iowa False Claims Act)................................................49

COUNT XII (Violation of Massachusetts False Claims Act) ...........................49

COUNT XIII (Violation of Minnesota False Claims Act) ................................50

COUNT XIV (Violation of Montana False Claims Act)....................................51

COUNT XV (Violation of Nevada False Claims Act) ......................................52

COUNT XVI (Violation of New Jersey False Claims Act) ..............................53

COUNT XVII (Violation of New Mexico Fraud Against Taxpayers Act) .....................53

COUNT XVIII (Violation of New York False Claim Act) ................................54

COUNT XIX (Violation of North Carolina False Claims Act).........................55

COUNT XXI (Violation of Rhode Island False Claims Act)............................56

COUNT XXII (Violation of Tennessee False Claims Act)................................57

COUNT XXIII (Violation of Vermont False Claims Act) ................................57

COUNT XXIV (Violation of Virginia Fraud Against Taxpayers Act) ...........................58

COUNT XXV (Violation of False Claims to Government of Puerto Rico Programs, Contracts, and Services Act)................................................................59

VII.    PRAYER FOR RELIEF .........................................................................60

## FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE COUNTERPARTS

On behalf of the United States of America, as well as seventeen States, the District of Columbia, and the Commonwealths of Massachusetts, Puerto Rico, and Virginia (collectively, the "Whistleblower States"), Relators Paul Terrion and Jody Eberhart ("Relators") hereby file this Complaint against Defendants Point Blank Enterprises, Inc. and John Does Nos. 1-50, Fictitious Names (collectively, "Defendants"), pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*; the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. §§ 44-9-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee False Claims Act, Tenn. Code §§ 4-18-101 *et seq.*; the Vermont False Claims Act, Vt. Stat. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; and the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act, P.R. Laws tit. 32, §§ 2931 *et seq.*

## I.      INTRODUCTION

1.      During the Civil War, the United States Army relied on private contractors to provide necessities such as uniforms, weaponry, and transportation.  Many contractors, motivated by greed, cut corners, providing soldiers with "firearms that would not fire, munitions filled with sawdust instead of gunpowder, and horses and mules that were old, lame, and on occasion blind as well," as well as "uniforms that literally fell apart in the rain."[1]  Facing widespread fraud that compromised soldiers' safety, Congress enacted the False Claims Act, incentivizing individual whistleblowers to assist the government in combating that fraud.[2]

2.      Although the False Claims Act has resulted in the return of tens of billions of dollars to the federal fisc, many unscrupulous individuals and corporations continue to cut the same corners that plagued the Army and put soldiers at risk during the Civil War.  This case is the latest in a long line of government contractors putting profit above safety.

3.      Defendant Point Blank Enterprises, Inc. ("PBE") manufactures body armor worn by military personnel, law enforcement officers, and first responders throughout the country.  To differentiate its products in the competitive body armor market, Defendant PBE developed a proprietary shoulder strap system for their vests called a "Self-Suspending Ballistic System" ("SSBS").

4.      Most body armor comprises ballistic panels (meant to absorb the force of projectiles) that are housed within an outer shell, called a carrier.  The ballistic panels typically fit into slots on the front and rear of the carrier.  The carrier is then worn on the body like a vest.  In

---

[1] Robert C. Winters *et al.*, *An Introduction to Crime and Crime Causation* 244 (2014).

[2] *Id.*

a traditional design, the front and rear panels of the vest are affixed to each other and secured to the body with "hook-and-loop" fasteners, of which Velcro is the most well-known type.

5.     PBE's SSBS is a radical departure from traditional body armor design.  Instead of housing the ballistic panels inside a carrier and then securing the carrier to the body, SSBS body armor has built-in shoulder straps.  "Gator-mouth" or "c-clamp" holders with "hook" material are sewn into the upper corners of each ballistic panel.  These are designed to clamp onto an external shoulder strap comprising "loop" material.  The front and rear ballistic panels are thus connected to one another via the shoulder straps, and are "self-suspending" within the carrier.  The ostensible reason for this new design was to keep the ballistic panels from sagging within the carriers.

6.     However, by incorporating the shoulder strap system directly into the ballistic panels, PBE introduced a new potential point of failure.  In an ordinary body armor system, the shoulder straps are on the outside of the carrier, presenting a large surface area for the hook and loop sections to fasten.  In addition, if the shoulder straps deteriorate, they easily can be replaced by ordering a new inexpensive carrier.  With SSBS body armor, the connection of the shoulder straps is limited by the smaller surface area of the c-clamp holders.  If the shoulder straps fail, they cannot easily be replaced because the c-clamps are sewn into, and compose part of, the ballistic panel itself.  Additionally, because approximately ninety percent of law enforcement officers are required to wear body armor while on duty, returning the panels to PBE for repair—a process that takes two to four weeks—is infeasible.

7.     PBE's original SSBS shoulder strap design, manufactured from approximately 2004 to approximately 2009, was robust and well-built, with real hook-and-loop fasteners, a broad surface area at which the fasteners would attach (approximately eight square inches at each end of the strap), and multiple points of reinforcement to keep the vest in place even if the straps became

unfastened.  This design ensured that the shoulder straps would not come unfastened with ordinary use, and that the body armor would remain in place on the user's torso.

8.      Beginning in approximately 2009, in an effort to cut costs, PBE altered the design of its SSBS shoulder straps.  Instead of including multiple points of reinforcement, the straps now attach at only one point on each end.  Instead of a broad surface area to which the straps attach, the vest now includes small, half-circle c-clamps, reducing the surface area of the fasteners by more than fifty percent.  Instead of using a real hook-and-loop fastener system, the shoulder strap—which formerly had a robust loop fastener material—was replaced with two thin pieces of knit fabric (similar to a t-shirt) glued to each side of a foam center.  The c-clamp—which formerly had a robust, woven hook fastener material—was replaced with a lower-quality hook fastener with a laminated backing.

9.      Individually, each of these cost-cutting measures substantially reduces the quality and durability of the shoulder strap system.  Collectively, they pose a deadly risk to the wearer. Although the fabric used in the SSBS shoulder straps has some ability to latch onto a hook fastener when new, it is not designed for use in such a fashion—especially not to support the weight of a bulletproof vest.  This defect is compounded by the small surface area of the fasteners, which is insufficient to maintain a solid grip on the shoulder strap.  In addition, exposing the SSBS straps to heat and moisture—elements commonly encountered by those who wear the vests—causes the SSBS closure rapidly to weaken.  Moreover, the laminated c-clamp fasteners tend to warp over time, bending backwards away from the shoulder strap, further weakening the connection of the shoulder strap to the vest.  These defects are exacerbated when the SSBS is repeatedly engaged and disengaged in accordance with PBE's advertisements and maintenance instructions.

10.     All of these defects combine to result in the catastrophic failure of PBE's body

armor under normal use.  PBE's shoulder straps unexpectedly detach in the line of duty, causing the vests to sink down inside the user's uniform or hang loose outside of the uniform.  Either circumstance exposes the wearer to extreme danger and the possibility of death.

11.     Despite their knowledge of these defects, PBE marketed and sold its SSBS body armor to federal, state, and local government agencies, as well as directly to military personnel, law enforcement officers, and first responders, many of whom are required to wear body armor every day.  Over the past five years, PBE has sold approximately 450,000 vests, most of which were paid for at least in part with taxpayer funds.

12.     A vest that cannot properly be worn has no value.  PBE has understood that, as a condition of payment, its ballistic panels, including the SSBS strap system, were required to satisfy their warranties by remaining fit for use as body armor for five years.

13.     As a result of PBE's fraud, military personnel, law enforcement officers, and first responders have purchased, and relied on defective body armor that puts their lives at risk.

14.     PBE's SSBS body armor was defective in that it did not and would not meet the following standards of performance: (1) the guarantee in the ballistic panels' five-year warranties, (2) the industry standard of maintaining performance over five years, and (3) the purchasers' reasonable expectations that the body armor would continue to meet the minimum level of ballistic protection set forth in National Institute of Justice Standards 0101.03 and 0101.04 for the five-year performance period set in its warranties and listed on its labels.

15.     PBE  knowingly submitted or caused to be submitted false claims for payment and made false statements about the defective SSBS body armor.  These claims were factually false because the body armor for which these claims were submitted was defective, and thus, in each instance, the contracted-for item—a non-defective bulletproof vest—was never delivered.  These

claims were also legally false in that the five-year warranties were incorporated into the relevant contracts, and PBE understood that, as a condition of payment, the body armor was required to satisfy its five-year warranty by remaining fit for use as body armor for five years.  Furthermore, PBE fraudulently induced the government's purchases by withholding data and information about the defectiveness of the SSBS body armor.

16.     Had the governmental entities that paid for the body armor known it was defective, the entities would not have paid for the body armor. As a result of PBE's misconduct, federal, state, and local government agencies have been defrauded out of hundreds of millions of dollars.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over claims brought on behalf of the Whistleblower States and Whistleblower Localities pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a).

18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

19.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendants own and operate businesses within this judicial district, and certain acts that form the basis of this Amended Complaint occurred in this judicial district.

20.     The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.     Relators

21.     Paul Terrion is an experienced law enforcement officer based in Brook Park, Ohio. He served as an Ohio State Highway Patrol Trooper for more than twenty-five years.

22.     Throughout his tenure as a law enforcement officer, Trooper Terrion has been required to wear body armor while on duty.  Trooper Terrion has worn several different styles of body armor from several different manufacturers, including PBE.  Trooper Terrion formerly wore a PBE SSBS vest that suffered the type of catastrophic shoulder strap failure described in this Complaint.  Based on his extensive firsthand experience with body armor, Trooper Terrion has developed substantial expertise regarding the appropriate design of body armor shoulder straps, as well as the defects in the vests complained of in this action.

23.     Trooper Terrion's knowledge formed the original basis for this Complaint, as well as parallel class-action litigation in Florida and California.

24.     In March 2017, Trooper Terrion contacted the Ohio State Troopers Association ("OSTA") to inform them that his PBE SSBS vest was failing.  Trooper Terrion realized that his vest's shoulder straps would no longer engage because the c-clamp closures were severely warped and the shoulder straps were badly frayed.  Trooper Terrion's vest was unable to be worn after only two years of ordinary use, with strict adherence to PBE's care and maintenance instructions.

25.     Trooper Terrion had firsthand knowledge as to not only the failure of the SSBS but also what was (and what was not) contributing to the failure.  Through his daily interaction and end-user experience with the actual failing SSBS, Trooper Terrion was able to determine that the SSBS closure system used substandard components and was defective.  Trooper Terrion was able to apply this same firsthand experience when the OSTA surveyed its membership and received several more complaints regarding similar vest failures.  Trooper Terrion's firsthand experience led him to conclude that PBE's SSBS vests were uniformly defective in manufacture, design, and

workmanship, and that they all carried a latent defect such that they were likely to fail prior to the expiration of their five-year warranty periods.

26.     Jody Eberhart is an active sworn police officer in the Ebensburg Police Department in Pennsylvania and a member of the U.S. Army Reserve.  Since 2016, Mr. Eberhart has served as the Business Development Manager for the National Sheriffs' Association, where his responsibilities include assisting in the oversight of operations and procurement for over 3,000 sheriffs' offices and 2,400 jails nationwide.  Mr. Eberhart has over a decade of experience in designing, testing, wearing, selling, and procuring body armor.  Based on his extensive firsthand experience with body armor, Mr. Eberhart has developed substantial expertise regarding the appropriate design of body armor shoulder straps, as well as the defects in the body armor complained of in this action.

27.     Beginning in March 2017, Mr. Eberhart performed inspections and tests of the vests of Trooper Terrion and other officers whose vests had failed.  Mr. Eberhart also performed a visual inspection and performance tests on a new PBE SSBS vest.  Through these tests, Mr. Eberhart determined that the SSBS suffered from systematic defects, that these defects rendered the vests likely to fail prior to the expiration of their five-year warranty periods, and that no rational and informed law enforcement officer could have trust in the integrity of the SSBS.

28.     Beginning in July 2017, Relators began to correspond with the Department of Justice regarding the allegations in this Complaint.  On July 24, Relators, through counsel, sent the Department of Justice a PowerPoint Presentation containing the core allegations in this Complaint, including:

- PBE's SSBS vests use a small molded c-clamp with Velcro-like hook material and a neoprene strap instead of loop Velcro;

- PBE uses knockoff neoprene material instead of genuine Breathe-O-Prene, as advertised in PBE's marketing materials;

- PBE warrants its ballistic panels, including the SSBS closure system, for five years;

- The aforementioned design flaws cause PBE's SSBS vests to fail under ordinary conditions of use well before the expiration of the five-year warranty;

- PBE's SSBS vests have failed in the line of duty for several users;

- Those who wear PBE's SSBS vests often are required to rely on self-help measures to keep the vests intact, including using duct tape and safety pins.

29.     On July 31, 2017, Trooper Terrion, through counsel, sent the Department of Justice an updated PowerPoint Presentation covering the same topics, as well as a letter summarizing the allegations in this Complaint and evidence that PBE had widely sold its vest to government purchasers.  On August 2, 2017, Relators met in-person with the Department of Justice, during which they discussed the allegations in this Complaint, as well as the fact that thousands of defective SSBS vests had been paid for with federal, state, and local funds.

30.     On October 19, 2017, Relators, through counsel, sent an additional letter to the Department of Justice, attaching a draft of the complaint in *Ohio State Troopers Association, Inc. v. Point Blank Enterprises, Inc.*, which would later be filed in the United States District Court for the Southern District of Florida under case number 0:18-cv-63130.  This draft was substantially similar to the complaint that was eventually filed, and it contained, *inter alia*, the following allegations:

- PBE "breached its express and implied warranties, and misrepresented and omitted material facts, regarding the quality, condition, suitability and safety of the SSBS Vests, and concealed that these vests contain a manufacturing defect, which has created an

imminent and substantial danger and risk of injury and death to the . . . persons who use and depend upon the vests";

- "The connection devices incorporated into the sealed ballistic panel system connecting the ballistic panels to the shoulder straps are defectively designed, contain[] defects in material and workmanship, fail and result in the Vision, Elite and other SSBS Vests at issue posing a life-threatening safety risk to end users" because they "unexpectedly fall apart in the field"; and

- "The entirety of the [SSBS] 'ballistic' system is warranted by [PBE] for not only the five-year period for 'components' of the 'ballistic system' but also warranted to 'keep[] the ballistic panels completely suspended . . . throughout the life of the vest."

31.     On February 28, 2018, Relators, through counsel, sent the Department of Justice a letter containing preliminary laboratory test results demonstrating the rates of deterioration and microphotographs of the SSBS alleged in this Complaint.  The letter also informed the Department of Justice that replacement straps would not correct the issue of unexpected failure of the SSBS in the field.

32.     On November 20, 2019, Relators, through counsel, participated in a phone call with the Department of Justice during which they again summarized the allegations in this Complaint.  On November 25, 2019, Relators, through counsel, sent the Department of Justice and all of the jurisdictions named in the original Complaint a detailed memorandum summarizing the allegations in the Complaint, as well as a near-final draft of the original Complaint, laboratory test data, and additional documents confirming the allegations in the Complaint.

33.     Relators are an original source of the allegations in this Complaint, and the allegations are not based upon publicly disclosed information.  To the extent the Court finds the

allegations in this Complaint are based upon publicly disclosed information, Relators voluntarily disclosed to the Government the information on which the allegations or transactions in the claims asserted in this Complaint are based prior to any public disclosure.  Moreover, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this action.

34.     Relators voluntarily provided the government with the information upon which the allegations in this Complaint are based prior to the filing of the Complaint in accordance with 31 U.S.C. § 3730(b)(2) and its state-law analogues.

**B.     Defendants**

**1.     Point Blank Enterprises, Inc.**

35.     Point Blank Enterprises, Inc. ("PBE") is a corporation incorporated under the laws of the state of Florida, with its principal place of business at 2102 SW 2nd Street, Pompano Beach, Florida 33069.  Although PBE has operated under different names at various time, PBE advertises that it has been developing, manufacturing, marketing and distributing body armor "since 1973." PBE is the largest supplier of ballistic and soft armor products for the U.S. military and law enforcement.  PBE has a body armor market share of approximately fifty percent among domestic law enforcement agencies.

36.     At all times relevant herein, PBE has engaged in the business of manufacturing, marketing, warranting, distributing, and selling the SSBS vests at issue in this ligation through wholly-owned subsidiaries and/or brand names, including Point Blank Body Armor, Inc. ("PBBA"), Protective Apparel Corporation of America ("PACA"), Paraclete, Protective Products Enterprises ("PPE"), Advanced Technology Group, SOB Defense Systems, and Protective

Apparel (formerly Short Bark Industries). Throughout this complaint, "PBE" is used to describe both Point Blank Enterprises, Inc. and these subsidiaries and brand names.

### 2. John Does Nos. 1-50, Fictitious Names

37. John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme described herein.

38. To the extent that any of the conduct or activities described in this Amended Complaint was not performed by Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme described herein.

39. As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States, the Whistleblower States, and the Whistleblower Localities have suffered financial harm.

## IV.   BACKGROUND

### A.   The False Claims Act

40. The federal False Claims Act ("FCA") and its state counterparts prohibit "knowingly" presenting or causing to be presented to the government any false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

41. The FCA and its state and local counterparts prohibit "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim. *Id.* § 3729(a)(1)(B).

42.     The FCA and its state and local counterparts further impose liability upon any person who conspires to commit a violation of the FCA.  *Id.* § 3729(a)(1)(C).

43.     The FCA and its state and local counterparts define a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient.  *Id.* § 3729(b)(2)(A).

44.     Requesting payment for goods that are defective, of lesser quality than those for which the government contracted, or do not meet the specifications or requirements of the contract constitutes a false claim under the FCA and its state and local counterparts.  When Congress first enacted the FCA in 1863, defective products—which wasted taxpayer money and "endangered 'military operations'"—were among its primary concerns.[3]  Indeed, "[t]he original FCA was designed to combat defense procurement fraud."[4]  As Senator Henry Wilson stated when he introduced the bill:

> We have all of us seen enough . . . of frauds perpetrated upon the Government, and above all, and more than all, perpetrated upon our soldiers in the field; and I trust that the Senate will pass this bill . . . that will put fraudulent contractors in a position where they may be punished for their frauds.[5]

45.     When Congress amended the FCA in 1986, it expressed similar concerns, "noting that defective military products cause 'not only a serious threat to human life, but also to national

---

[3] Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* 169 (2d ed. 2010) (quoting Cong. Globe, 37th Cong., 3d Sess. 955 (1863) (statement of Sen. Howard)).

[4] James B. Helmer, Jr., *False Claims Act: Whistleblower Litigation* 59 (7th ed. 2017).

[5] *Id.* at 61 (quoting Cong. Globe, 37th Cong., 3d Sess. 348 (1863)).

security.'"[6]

B.     **Body Armor Purchase Process**

46.     Body armor is worn by military personnel and law enforcement officers throughout the world.  In addition, many first responders, including firefighters and EMS personnel, wear body armor because they often are dispatched to respond to shootings.  The price of a bulletproof vest typically ranges from about $700 to about $1,000.

47.     Those who wear body armor typically do so under a "mandatory wear" policy; that is, their employer requires them to wear body armor while on duty.

48.     Body armor is generally acquired through one of two methods: either the wearer himself or herself will purchase body armor directly from a manufacturer or distributor, or a government agency (through a quartermaster or purchasing agent) will purchase body armor for use by its employees.  In the former case, the employee is typically given a stipend funded by the government with which to purchase the armor or is reimbursed for the purchase by his or her employer.

49.     PBE sells most vests through a layered process; it supplies vests through distributors, who then handle fitting and sizing in a process similar to seeing a tailor and being fitted for a suit.  The distributor then sends the customer's sizing information to PBE, which manufactures the vest to the customer's specifications and ships the vest directly to the customer, to a distributor, or to a retail store, depending on the preference of the customer and the circumstances of the purchase.

---

[6] Sylvia, *supra* note 3 at 170 (quoting S. Rep. No. 99-345, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

50.     Body armor is not a one size fits all product.  To ensure a proper fit, manufacturers, including PBE, produce multiple sizes of body armor and will even produce made-to-measure armor that conforms to the individual wearer.  Accordingly, body armor is not fungible; if a wearer's vest fails, he or she usually cannot simply don another vest, as even subtle differences in sizing can prevent a vest from fitting properly.  In addition, even if it were possible to substitute any given failed vest for a new one, the high cost of body armor typically means that government agencies lack the resources to purchase spare vests in the first place.

51.     Body armor—more specifically, the ballistic material inside body armor—is available in different levels of protection.  These ballistic levels are defined by the National Institute of Justice ("NIJ"), and arm of the U.S. Department of Justice ("DOJ") that is responsible for certifying and approving the ballistic capability of every body armor design.[7]

52.     Ballistic levels range from a low of IIA to a high of IV.  However, the SSBS vests at issue in this case fall into only three levels: IIA (the lowest level of protection, designed to stop smaller rounds of ammunition fired at slower speeds), II (an intermediate level of protection, designed to stop larger rounds of ammunition fired at higher speeds) and IIIA (the highest level of protection, designed to stop even larger and faster rounds of ammunition).

53.     In the vast majority of instances in which a police officer is shot, he or she is shot with his or her own sidearm (which an assailant has taken).  Accordingly, police departments typically require their officers to wear body armor corresponding to the NIJ ballistic level that will provide protection from whatever sidearm the officers are issued.  Most police departments require officers to wear armor at the II or IIIA levels.

---

[7] The NIJ does not test or certify the effectiveness or durability of body armor strap systems such as the SSBS at issue in this case.

### 1.   U.S. Military and Federal Government Purchases

54.   The General Services Administration (GSA) is an agency of the federal government with responsibility for administering the Multiple Award Schedule (MAS) contracting program.

55.   Under the MAS program, GSA negotiates contracts for commonly used commercial items with contractors.  Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices, terms, and conditions.  Products are grouped under predesignated Special Item Numbers (SINs) which connote broad categories of commercial products or services.

56.   The GSA Schedule includes, and has long included, body armor manufactured and sold by PBE.  In addition, federal government agencies sometimes purchase bulletproof vests directly from a manufacturer or distributor, apart from the GSA Schedule.

57.   Federal agencies also purchase body armor directly from manufacturers or distributors, other than through the GSA Schedule.

58.   Federal government agencies purchase thousands of vests annually.  For approximately ten years, the federal government has purchased tens of thousands of defective SSBS vests at a cost of tens of millions of dollars.

59.   For example, on September 22, 2014, the government entered into contract number DJF141200V0012382 with PBE and Tactical & Survival Specialties, Inc.—a supplier of military and first-responder equipment—to supply PBE's Alpha Elite SSBS body armor, primarily to the Federal Bureau of Investigation.  The Department of Justice, Department of Homeland Security, Department of the Interior, Department of the Treasury, and the Environmental Protection Agency have expended $11.9 million under this contract to date:

**Expenditures under Contract DJF141200V0012382**

| Date | Subaward No. | Agency | Expenditure |
|---|---|---|---|
| 2014-09-22 | DJF141200D0002788 | DOJ | $ 598,806 |
| 2014-11-04 | DJF151200D0000066 | DOJ | $ 1,237,574 |
| 2014-12-02 | DJF151200D0000156 | DOJ | $ 24,988 |
| 2015-01-13 | DJF151200D0001898 | DOJ | $ 2,400,678 |
| 2015-03-10 | DJF151200D0000537 | DOJ | $ 25,560 |
| 2015-03-13 | DJF150200D0000560 | DOJ | $ 23,868 |
| 2015-07-06 | DJF151200D0001620 | DOJ | $ 22,680 |
| 2015-08-03 | DJF151200D0001965 | DOJ | $ 283,500 |
| 2015-08-12 | DJF151200D0002128 | DOJ | $ 105,032 |
| 2015-09-24 | DJF151200D0002988 | DOJ | $ 2,702,322 |
| 2015-11-12 | DJF161200D0000094 | DOJ | $ 34,980 |
| 2015-11-24 | EPG16H01213 | EPA | $ 13,608 |
| 2016-01-15 | HSCEMS16F00010 | DHS | $ 15,701 |
| 2016-02-23 | DJF161200D0000635 | DOJ | $ 241,850 |
| 2016-04-07 | DJF161400D0001081 | DOJ | $ 17,089 |
| 2016-05-03 | HSCEMS16F00021 | DHS | $ 4,404 |
| 2016-06-07 | DJF162200D0001657 | DOJ | $ 9,197 |
| 2016-06-22 | EPG16H01327 | EPA | $ 43,272 |
| 2016-06-24 | TFSASIG16K0007 | Treasury | $ 36,674 |
| 2016-07-26 | DJF162200D0002179 | DOJ | $ 20,412 |
| 2016-08-08 | DJF161200D0002307 | DOJ | $ 52,104 |
| 2016-09-12 | INR16PD01043 | DOI | $ 13,590 |
| 2016-10-01 | DJG17OIGE0015 | DOJ | $ 15,106 |
| 2017-01-09 | DJF171200D0000307 | DOJ | $ 132,583 |
| 2017-01-30 | DJF171200D0000393 | DOJ | $ 95,130 |
| 2017-01-31 | DJF171200D0000445 | DOJ | $ 92,584 |
| 2017-02-16 | DJF171200D0000580 | DOJ | $ 111,552 |
| 2017-03-02 | DJF171200D0000657 | DOJ | $ 45,318 |
| 2017-03-08 | DJF172200D0000696 | DOJ | $ 8,148 |
| 2018-01-09 | 15F06718F200F0000387 | DOJ | $ 135,419 |
| 2018-03-12 | 15F06718F0000561 | DOJ | $ 1,461,699 |
| 2018-08-07 | 15F06718F0001818 | DOJ | $ 94,122 |
| 2018-12-03 | 15F06719F0000232 | DOJ | $ 1,129,270 |
| 2019-02-25 | 15F06719F0000553 | DOJ | $ 163,350 |
| 2019-02-25 | 15F06719F0000554 | DOJ | $ 477,591 |
| | | **Total:** | **$ 11,889,761** |

Because of the latent defects in this body armor described in further detail below, all of these purchases constitute false claims.

60.     As a further example, on December 8, 2018, the U.S. Air Force entered into purchase order FA701419PA003 with Quantico Tactical Inc. to supply, *inter alia*, 85 of PBE's SSBS vests.  The Air Force expended a total of $106,865.05 under this purchase order on February 1, 2019, nearly all of which was used to pay for PBE's SSBS vests.  Because of the latent defects in this body armor described in further detail below, all of these purchases constitute false claims.

## 2.     State and Local Law Enforcement Purchases

61.     Between 1985 and 1994, 709 law enforcement officers in the United States were feloniously killed in the line of duty.[8]  During the same period, bullet-resistant materials helped save the lives of over 2,000 law enforcement officers in the United States.[9]  Nevertheless, by 1998, 25 percent of state, local, and tribal law enforcement officers were not issued body armor.[10]

62.     To close this gap, Congress created a grant program called the Bulletproof Vest Grant Partnership Act (BVP), currently codified at 34 U.S.C. §§ 10530-34.  The BVP grant program is administered by the Bureau of Justice Assistance, a division of the DOJ.

63.     Under the BVP grant program, the United States reimburses state, local, and tribal authorities up to fifty percent of the cost of ballistic vests.[11]  The exact amount state, local, and tribal law enforcement agencies are reimbursed for a specific vest varies based on the entitlement cap for each such agency for that fiscal year.

64.     Purchasers under the BVP grant program include state, local, and tribal law enforcement agencies.   These purchasers make claims for reimbursement to the federal

---

[8] Bulletproof Vest Partnership Grant Act of 1998, Pub. L. 105-181, § 2(a)(2), 112 Stat. 512, 512 (1998).

[9] *Id.* § 2(a)(5).

[10] *Id.* § 2(a)(4).

[11] 34 U.S.C. § 10531(f)(1).

government after receiving their vests.  Law enforcement agencies may be reimbursed only for vests replaced on a 5-year basis.  As of November 2020, the BVP program had awarded approximately $522 million to over 13,000 jurisdictions for the purchase of over 1 million vests.[12] In fiscal year 2021, the federal government awarded $25,628,667.99 to states and municipalities through the BVP program.[13]

65.   Each state enters into contracts with body armor manufacturers to establish a negotiated price list for various models of body armor, often including volume-based discounts. Twenty-six states are members of the National Association of State Procurement Officials ("NASPO"), which negotiates a master price agreement that can be modified to fit each state's particular needs.[14]  Localities and law enforcement agencies sometimes negotiate their own price lists with manufacturers, sometimes pool their resources with other agencies to take advantage of their shared purchasing power, and sometimes simply purchase body armor at retail prices.

66.   State and local government agencies purchase thousands of vests annually.  For approximately ten years, state and local government agencies have purchased tens of thousands of defective SSBS vests at a cost of tens of millions of dollars.  A significant portion of these purchases has been subsidized by the federal government through the BVP grant program.

67.   For example, on October 24, 2016, the city of Cheyenne, Wyoming entered into purchase order 17-091087 with Skaggs Companies, Inc., whereby it purchased several of PBE's SSBS vests for a total of $9,560.  The federal government reimbursed $4,780 of this purchase

---

[12] *Bulletproof Vest Partnership*, Office of Justice Programs, https://ojp.gov/bvpbasi/ (last visited Apr. 15, 2022).

[13] Office of Justice Programs, *FY 2021 BVP Awards*, https://www.ojp.gov/sites/g/files/xyckuh241/ files/media/document/fy_2021_bvp_awards.pdf (last visited Apr. 15, 2022).

[14] For example, if a state requires certain body armor attachments or accessories, it will negotiate a separate price list to reflect those additions.

through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

68.     As a further example, on May 17, 2017, PBE entered into contract number CT178120171426328 to supply PBE's SSBS body armor to New York City law enforcement officers.  New York City expended approximately $97,520 under this contract, including a payment of approximately $94,650 on September 18, 2017 and a payment of approximately $2,860 on October 17, 2017.  The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

69.     As a further example, on November 7, 2017, the city of San Diego, California entered into purchase order 4000008003 with San Diego Police Equipment Co., whereby it purchased 199 of PBE's SSBS vests for a total of $137,574.67.   The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

70.     As a further example, Williamson County, Texas placed the following orders with Miller Uniforms & Emblems, Inc. for PBE's SSBS vests in 2017:

| Invoice Date | Invoice No. | No. of Vests | Expenditure |
|---|---|---|---|
| 2017-12-13 | 94656 | 1 | $     831.55 |
| 2017-12-13 | 94657 | 1 | $     930.55 |
| 2017-12-20 | 95711 | 1 | $     930.55 |
| | | **Total:** | $   **2,692.65** |

The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

71.     As a further example, on February 27, 2018, the city of San Angelo, Texas entered into purchase order 116734 with Miller Uniforms & Emblems, Inc., whereby it purchased 9 of PBE's SSBS vests for a total of $8,156.70.  On April 18, 2018, the city of San Angelo, Texas entered into purchase order 117001 with Miller Uniforms & Emblems, Inc., whereby it purchased 6 of PBE's SSBS vests for a total of $5,437.80.  The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

72.     As a further example, in May 2018, the Sheriff's Office of Bexar County, Texas ordered 78 of PBE's SSBS vests from Nardis Public Safety, for a total of $59,982.  In March 2019, the Sheriff's Office of Bexar County, Texas ordered 250 of PBE's SSBS vests from Nardis Public Safety, for a total of $191,647.50.  The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

73.     As a further example, the San Antonio Police Department placed the following orders with Nardis Public Safety for PBE's SSBS vests in 2019 and 2020:

| Order Date | Invoice Date | Invoice No. | No. of Vests | Expenditure |
|---|---|---|---|---|
| 2019-10-02 | 2019-11-26 | 0180764-IN | 7 | $    6,124.44 |
| 2019-10-18 | 2019-12-06 | 0181346-IN | 3 | $    2,624.76 |
| 2019-10-28 | 2019-12-10 | 0181557-IN | 64 | $  55,994.88 |
| 2019-11-21 | 2020-01-02 | 0182775-IN | 4 | $    3,499.68 |
| 2019-10-28 | 2020-01-02 | 0182776-IN | 4 | $    3,499.68 |
| 2019-11-08 | 2020-01-23 | 0184198-IN | 4 | $    3,499.68 |
| | | | **Total:** | $    **75,243.12** |

On August 13, 2020, the city of San Antonio enacted ordinance 2020-08-13-0511 whereby the city ratified the aforementioned purchases.  The federal government reimbursed a significant portion

of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

74.     As a further example, on June 1, 2021, the Township of Bern, Pennsylvania approved the purchase of 50 of PBE's SSBS vests for a total of $10,444.92.  The federal government reimbursed a significant portion of these purchases through the BVP program. Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

75.     As a further example, on March 1, 2022, the Virginia Department of Conservation and Recreation entered into order number EP3447136 with Town Police Supply, whereby it purchased 50 of PBE's SSBS vests for a total of $36,750.  The federal government reimbursed a significant portion of these purchases through the BVP program.  Because of the latent defects in this body armor described in further detail below, all of these purchases and reimbursements constitute false claims.

## V.     DEFENDANTS' FRAUDULENT SCHEME

### A.     Industry Standards and Ordinary Use

76.     Body armor comprises two primary components: ballistic panels, which provide stopping power for projectiles, and carriers, which hold the panels in place and are worn on the body.

77.     Body armor is manufactured in these two separate components so the carrier— which accumulates grime and sweat, and tends to wear out faster than the ballistic panels—can be washed or even replaced during the life of the ballistic panels.  Regardless of the type of vest, ballistic panels are typically warrantied for five years.  Carriers are typically warrantied for two years.

78.     In a typical vest design, the carrier is split into two parts: front and back.  Robust, Velcro-brand hook fasteners are attached to both ends of the shoulder straps, with a large piece of corresponding loop fastener on the panel itself.  The large size of the loop fasteners permits the wearer to adjust the effective length of the shoulder straps, and the large size of the hook fasteners ensures strong adherence between the strap and the carrier.  Ballistic panels are inserted into both the front and back pieces of the carrier.  Similar Velcro hook-and-loop straps secure the sides of the vest, ensuring a snug fit on the wearer.

79.     The industry standard for body armor design is exemplified by the following photos of a vest manufactured by Safariland, a competitor of PBE:



80.     All body armor manufacturers within the United States offer at least a five-year warranty on their bulletproof vests.  The idea that bulletproof vests would maintain their ballistic performance over five years is an industry standard.

**B.     Defendants' SSBS Vests & Departure from Ordinary Design**

81.    Beginning in approximately 2004, PBE developed its new SSBS shoulder strap technology that differentiated from the industry standard design.  Instead of affixing to the carrier, the shoulder straps in an SSBS vest affix to the ballistic panels themselves by attaching to four c-clamp fasteners—one at each shoulder of both the front and back ballistic panels.

82.    According to PBE, the SSBS design permits the ballistic panels to remain independently suspended within the carrier, preventing the panels from sliding around or rolling.  PBE's marketing materials advertise that the shoulder design of the SSBS fasteners allows for "easy donning and doffing" of the vest by disconnecting and reconnecting the shoulder straps.

83.    The following artist's rendering depicts the internal workings of the SSBS.  The c-clamp fastener (called a "gator mouth" by PBE), which contains a hook-like material, is sewn to the ballistic panel, rather than the strap.  The strap, which is made of a fabric that has some gripping properties, is designed to adhere to the c-clamp fastener.  The carrier fits around the strap and does not adhere to the straps or the ballistic panels:



84.     Although the initial SSBS design diverged from industry standards, it did not contain the defects identified in this Complaint.  The shoulder straps of the original SSBS vest design contained genuine loop Velcro, which attached to genuine hook Velcro in a large rectangular clamp-style fastener at each end of the strap, sewn into the top of the ballistic panel:



85.     These fasteners measured approximately two inches by two inches, providing approximately eight square inches of coverage at either end of the shoulder strap.  Additionally, both ends of the carrier contained additional patches of genuine Velcro hook material, providing additional gripping strength and serving as a failsafe in case the clamshell-style fastening system failed or came loose:

 

86.     The robustness of this shoulder strap design came at a price.  Genuine Velcro costs more than its generic counterparts (and considerably more than knit shirt-like fabric and neoprene), though it has better gripping power.  A woven hook fastener costs more than a laminated hook fastener, though it is more durable and not prone to warp.  Sewing genuine loop Velcro onto each shoulder strap means that each strap must be long enough to fit a variety of body sizes, with a correspondingly large piece of hook material to allow for length adjustments, though such a system is more durable than a neoprene strap that can be cut to fit by the wearer.

87.     PBE identified each of these tradeoffs between quality and price, and prioritized the latter in every circumstance.  In cutting costs everywhere it could, PBE has endangered the lives of everyone who wears its SSBS vests.

88.     In approximately 2009, PBE radically changed the design of the shoulder strap system.  PBE replaced all of the genuine Velcro in the shoulder strap system with a generic hook-and-loop fastener system manufactured overseas.  It then replaced the shoulder strap with a piece of fabric composed of a foam core glued to two strips of knit shirt-like fabric:



89.     The following photo depicts the original strap design (top) with the current strap design (bottom):



90.     PBE claims that the new strap is more convenient because it can be cut to fit by the wearer.  However, the new strap design is defective for at least five reasons.  *First*, as explained below, the ends of the straps tend to fray, often requiring the wearer to cut off a portion of the strap to access new fabric.  This causes the vest to have a suboptimal fit.

91.     *Second*, although the knit shirt-like fabric in the current SSBS vest design has some adherent properties when paired with a hook fastener, it is not designed for use with a hook fastener, especially when considering the weight of a bulletproof vest.  A close comparison between genuine Velcro loop material (left) and the knit shirt-like fabric used in the SSBS vests (right) reveals obvious dissimilarities, even to the naked eye:



92.    In addition to the inherent weakness of the connection between each fastener and the shirt-like fabric strap, the strap and fastener have additional latent defects that reduce their lifespan and lead to catastrophic failure.  The shirt-like fabric material, which is not designed to replace a loop material in a hook-and-loop system, rapidly frays with ordinary use, reducing its already weak grip strength.  The following photo depicts one of the straps of Trooper Terrion's vest, which is visibly frayed and unable to adhere to the small c-clamp fastener after only two years of use, with removal about twice a month:



93.     *Third*, the shirt-like fabric adhered to each shoulder strap is meagerly applied.  Each shoulder strap consists of a foam core measuring 0.125 inches in thickness.  The finished product thickness is 0.127 inches.  This means that the shirt-like fabric material adhered to each side of the foam core measures only 0.001 inches in thickness—less than one-quarter of the thickness of a dollar bill.  PBE's paltry application of this shirt-like fabric material further compounds the straps' weakness and tendency to fray explained above.

94.     *Fourth*, PBE replaced the large, genuine Velcro clamshell-style fasteners with c-clamps less than half the size containing a laminated generic hook material:



This single connection is inadequate to support the weight of the vest over its life.  As for the c-clamp fastener, moisture and heat cause the lamination to warp outwards, away from the strap, preventing it from fastening properly to the strap.  The following photo depicts one of the fasteners on Trooper Terrion's vest, which naturally and spontaneously warps outward and has been rendered almost entirely useless after only two years of ordinary use, unable to properly engage with the SSBS shoulder strap:



95.     *Fifth*, PBE removed the secondary Velcro fasteners on the carrier, leaving only one point of adhesion on either end of each shoulder strap.  This design change compounds the defects described above by removing a failsafe mechanism that could help to keep an SSBS vest in the proper position even if a strap begins to fray or a c-clamp begins to warp.

### C.     Laboratory Test Data Confirm the SSBS Vests Are Defective

96.     The failures in Trooper Terrion's vest are emblematic of the defects present in every SSBS vest.  Laboratory test data from Clemson University's Department of Materials Science and Engineering confirm that the SSBS will not properly perform and maintain its integrity for the entirety of its warranty period.  These laboratory test data demonstrate that if a new SSBS vest is cycled (donned and doffed) under normal conditions of use by disconnecting the SSBS closure (regardless of whether by shearing or peeling), the strapping system weakens to a point where the closure lacks sufficient strength to securely support the weight of the vest when on an officer.

97.     The laboratory test data demonstrate a substantial drop-off in shear strength,[15] with

---

[15] Shear strength is the strength of a material against shear load: a force that produces a sliding failure on a material along a plane that is parallel to the direction of the force.

the straps losing 85% of initial shear strength over just 100 shear tests (approximately 5 months of donning and doffing only once per day, five days a week). Given that SSBS vests weigh approximately 5 pounds, after approximately 75 shear tests, the closure will not support the weight of the vest and will not keep it from falling down at the connection point.

98.     Similarly, the laboratory data demonstrate a substantial drop-off in peel strength,[16] with the straps losing approximately 50% of peel strength over just 50 peel tests per side of the SSBS closure system (approximately 2.5 months of donning and doffing by disconnecting the SSBS once per day, five days a week).

99.     Furthermore, the test data demonstrate that the SSBS will prematurely deteriorate and is prone to fail within the warranty period even if the SSBS closure is disengaged and engaged only occasionally so that the carrier can be removed and laundered. Put differently, the normal daily tension placed on the SSBS closure will cause the vest to fail within the warranty period.

100.    These defects are exacerbated by the presence of moisture—a particularly problematic result, considering the extremely high likelihood that the wearer of a vest will perspire or encounter precipitation on any given day. In particular, the knit shirt-like fabric strap rapidly loses its ability to adhere to the laminated c-clamp fastener after being cycled when wet.

101.    The laboratory data starkly contrast with PBE's advertisements, representations, and warranties as to the performance capability of the SSBS vests—that purchasers should be able to cycle the SSBS connection twice daily for easy "doffing and donning" for five years.

102.    One of the mechanisms of the failure is shown by the following microphotographs. Far from being robust, there is only a very thin layer of loop-like fiber on an SSBS strap. Upon repeated cycling of the SSBS connections, the plastic-like hook material in the SSBS clamps

---

[16] Peel strength is the strength of an adhesive bond between two materials.

breaks apart one end of fibers from the strap.  Thus, the loop-like fiber is unable to engage the hook and connect the strap to the fastener.  As shown below, the used strap material (right) is in far worse condition than the new strap material (left).  The used strap material is broken apart and straightened, unable to engage with a hook fastener:



### D.    PBE's Defective Vests Pose an Extreme Safety Hazard

103.    SSBS vests are prone to fail well before the expiration of their five-year warranty period.  When a vest fails, it can fall down inside a wearer's uniform (in the case of concealable vests) or hang loose outside the uniform (in the case of external vests).  In either case, the failure of the SSBS shoulder straps to support the vest adequately poses an extreme safety hazard to the wearer, who is left unprotected.

104.    For example, Ohio State Trooper Trevor Koontz, whose vest fell apart while he was on foot patrol at the 2016 Republican National Convention in Cleveland, explained the defects this way:

> [T]here's a cancer in this vest. . . .  I was living my . . . day-to-day life with . . . metaphorically, a medical condition built into this vest, manufactured in this vest from Point Blank.  It came out.  It could have cost me my life.

105.    When an SSBS vest fails, the wearer, who may be in extreme danger, must retreat to an area of relative safety and attempt to re-adhere the shoulder straps.  The majority of purchasers experiencing failures of the SSBS are forced to turn to self-help methods, including

duct tape, electrical tape, safety pins, and other methods to hold their vests together and address the safety hazard from the SSBS failure.  The following photos depict a few examples:

 



106.    Although these makeshift fixes can help an officer temporarily, they are insufficient to cure the defects inherent to PBE's SSBS vests.  Some of these fixes are transitory and prone to fail themselves; others are somewhat more durable but interfere with the fit of the vest and prevent a wearer from easily donning and doffing the vest by disconnecting the shoulder straps, per PBE's instructions.  A vest cannot protect an officer's life if it cannot be properly worn.

107.    Fully acknowledging the safety hazard presented by a SSBS that does not work properly and unexpectedly fails in the line of duty, PBE represents to all purchasers in the Care and Maintenance Manual that if the panels do "not stay in position" they must be replaced.

108.    Here, the ballistic panels do not stay in "proper position" because the SSBS vests suffer from defects in manufacturing, material, workmanship, and design, resulting in the SSBS prematurely failing.

109.    Compounding the problem, there is no method to repair a failed SSBS without returning the vest to PBE's manufacturing facility.

110.    PBE's standard repair time is between two weeks and one month.  However, the overwhelming majority of law enforcement agencies in the United States (and all agencies that accept federal funds) have a mandatory wear policy under which officers may not go on a single shift without their vests, let alone wait two to four weeks.  In addition, the overwhelming majority of law enforcement agencies in the United States do not have sufficient funding to purchase backup vests for use during this repair period.  Furthermore, even in large law enforcement agencies that have extra vests, a wearer likely will be unable to find a vest that fits an officer properly.  Therefore, returning a defective SSBS vest to PBE for repair is not a realistic option, forcing users to rely on the self-help measures described above.

### E.    The SSBS Is Uniformly Defective

111.    PBE tightly controls all aspects of the design, manufacture, marketing, distribution, and labeling of its body armor, including its SSBS vests.

112.    At all relevant times, SSBS vests have been sold directly by PBE or through PBE sales representatives and authorized distributors, which PBE refers to as "Point Blank's global distribution network."

113.    All SSBS vests, regardless of the make, model, or threat level, include the same SSBS described herein and suffer from the same latent defects.

114.    At all relevant times, PBE has manufactured and sold four models of concealable SSBS vests under its PBBA brand: C-Series, Hi-Lite, Vision, Elite.  At all relevant times, PBE has manufactured and sold three models of concealable SSBS vests under the PACA brand name: Standard, Perform-X, and Blue Steel.[17]

115.    In addition, at all relevant times, PBE has manufactured and sold tactical, correctional, and crossover vests (all of which are worn outside the clothing), including the Laser ODC,[18] Tank Track Laser ODC, Maverick ODC, Endeavor ODC, Standard ODC, Uniform ODC, Admin ODC, and International GEN II Slick.  All of these vests are designed to be paired with SSBS panels and all of these vests suffer from the same defects identified in the concealable SSBS vests.

116.    Furthermore, Galls, LLC, one of the largest body armor retailers, sells concealable SSBS vests manufactured by PBE under the GL, SE, and G-Force brand names.  These vests are identical to PBE's concealable SSBS vests except for branding.

117.     Regardless of the model, the SSBS in all SSBS vests is identical or substantially identical, suffers from the same defects, and is subject to the same warranties, misrepresentations, and omissions.

**F.    PBE Fraudulently Represented That Its SSBS Vests Would Last for 5 Years**

118.    At all times relevant to this action, PBE has supplied five-year written warranties

---

[17] The Hi-Lite and Perform-X vests are identical except for branding, as are the Vision and Blue Steel vests and the PBE Standard and PACA Standard vests.

[18] ODC stands for "outer duty carrier," a type of body armor that is worn outside of the clothing and typically contains pouches and compartments for equipment.

covering the SSBS and ballistic panel system, and a separate two-year written warranty for the carriers of its SSBS vests.

119.    At all relevant times, PBE's marketing materials have uniformly warranted for all SSBS vests that the SSBS will last "throughout the life of the Vest."  These materials have further represented that:

- the SSBS provides "optimal protective coverage," prevents "the rolling or sagging of the ballistic panels inside the carrier," and maintains "the coverage of the ballistic panels," all "throughout the life of the vest," which is at least five years;

- the vest and SSBS had a "five-year lifecycle" and that "zero compromises were made in performance or comfort";

- the SSBS could be disconnected daily for "easy doffing and donning" and for "adjustment," and that it was durable enough for that use; and

- "Point Blank Enterprises warrants the ballistic panels"—into which the defective SSBS c-clamps are permanently sewn—"for a period of five (5) years against manufacturing defects."

120.    PBE broadly disseminated its uniform marketing materials throughout the United States, including through press releases (typically through PRNewswire), law enforcement publications, its website, and an extensive distributor network, which in turn have additional prolific online presence and distribute print materials in retail law enforcement supply stores.

121.    PBE further has represented and advertised in its marketing materials, on its website, and in news articles (including, for example, in the January 2014 edition of "Law and Order" magazine published throughout the United States) that disconnecting the SSBS to don and doff the vests was not only normal and appropriate, but that doing so was a preferred and "easy"

method of donning and doffing its SSBS Vests and that officers—particularly women—often disconnect "one of the shoulder straps and remove the armor and carrier like a buttoned shirt - yes, to avoid dragging the armor over their face and hair."

122.    At all times relevant to this action, PBE has posted a training video on its website demonstrating that the normal and appropriate method to disconnect the SSBS is by pulling or shearing, or a combination of pulling/shearing and peeling the SSBS connection apart.

123.    A label is adhered to every set of PBE's SSBS ballistic panels.  According to this label, the "Warranty Period" for the entire panel, including the SSBS closure system, is five years. According to some labels, the panels also carry a separate "Ballistic Performance Warranty Period" of five years.

124.    Despite those representations and advertisements, and unbeknownst to any purchasers, internally, PBE's management has known prior to the sale of all SSBS vests at issue in this Complaint that the vests are not robust enough for regular cycling of the SSBS shoulder straps.

125.    Throughout all relevant times hereto, PBE has known that regular cycling of an SSBS vest will cause severe and rapid deterioration and failure of the SSBS.  PBE has actively concealed that information from federal, state, and local government purchasers.

126.    PBE has never warned any purchasers not to disconnect the SSBS connectors (by shearing, peeling, or otherwise), or that doing so would cause accelerated and severe deterioration of the SSBS and its resulting unexpected, premature failure.

127.    All SSBS vests are defective and the defects exist from the time the vests leave the manufacturing line, in that the SSBS will fail during and from normal use over time, prior to the expiration of the warranty period.

128.    Each time the SSBS connection is cycled as designed and recommended by PBE, the SSBS deteriorates and weakens to the point where it does not have sufficient strength to securely support the weight of the vest when worn, and the vest falls apart.   Repeated disengagement of the SSBS straps from the c-clamps, whether by peeling or shearing, rapidly accelerates the weakening of the SSBS closure, as does the introduction of moisture (*e.g.*, sweat or rain).

129.    Constant tension and pulling on the SSBS also results in failure, even where the SSBS is infrequently cycled, for example, occasionally to remove and clean the outer carrier of the vest (which requires disconnecting the SSBS).

130.    Substandard stitching of the c-clamps to the ballistic panels also causes a system failure of the SSBS as rapidly as within a few months.

131.    Prior to the sale of all SSBS vests identified in this Complaint, PBE had extensive knowledge of the vests' defects from its own studies and surveys and from its own research and design personnel.  Following the initial sale of the SSBS vests identified in this Complaint, PBE gained further knowledge of these defects from the severity and consistency of the problems reported from its field representatives and from consistent complaints from purchasers (including repeat complaints from purchasers).

132.    PBE has received, but concealed, extensive and alarming complaints from law enforcement personnel spanning the entire country.   PBE has received multiple complaints identifying the defects identified in this Complaint and notifying PBE that users were concerned for their safety, that the failures continue to occur in the line of duty and as soon as within a year, and that replacement straps do not correct the problem. Examples of these complaints from law

enforcement officers in California, Missouri, Nevada, New Jersey, New York, and West Virginia

are reproduced below:

- August 4, 2017: "Hello, this is the second time I've tried contacting someone there. I am a State Trooper with the Nevada Highway Patrol. I currently wear the Point Blank Vision [v]est and have about four years. I have been having problems with the shoulder Velcro straps not sticking, causing the vest to literally fall apart while wearing it during my shift, causing not only discomfort in the field but an unsafe situation with the vest falling down. It also takes me extra time before shift to try to get the strap to stick as it will fall apart as I don it, so I have to don it very carefully and not put weight on it. . . . I'm stuck in a tough situation now because my department will only purchase a new vest every five years and I can't afford to pay out of pocket, but this vest is unsafe to use as is. . . ."

- September 12, 2017: "I am a police officer with the La Mesa [San Diego County] Police Department. . . . [I've had a] new Point Blank vest for less then [*sic*] 2 years and the Velcro straps are already not working. The Velcro straps are folded up, don't stick to the vest and are becoming unusable."

- September 16, 2017: "About a year ago I made contact with someone with your company about shoulder straps not holding and had the Velcro replaced, I believe that the same issue is happening again, wondering what I could do?"

- September 19, 2017: "I have an issue regarding the Velcro straps on my vest. The 'clam shell' design that holds the straps in place seem to have failed completely. I have been forced to use duct tape and safety pins to keep it held together. I would like to have this fixed and did not want to take it to an outside source due to the fact that Velcro is attached directly to the vest."

- November 12, 2017: "I have an Elite vest I purchased about two years ago or more. . . . The Velcro on both panels are failing and the ballistic panel is tearing the corners of the vest carrier. I spent over $1100.00 on this set up and I don't I should be seeing these problems so soon."

- December 5, 2017: "Hi my names [*sic*] is Katherine. I am an officer for the NYPD and was issued a vest. However, I have under a year with the vest and already the Velcro straps have broken."

133.   PBE has knowingly manufactured and sold defective SSBS vests while willfully

concealing the true inferior quality, sub-standard performance, and other defects causing failure of

the SSBS.

134.    PBE failed to inform any purchasers of the defects prior to their purchase of SSBS vests.

135.    Beginning in January 2018, PBE published knowingly false and deceptive information as to the performance and effectiveness of the SSBS.  The published information has deceived purchasers by concealing the known latent defects in the SSBS vests.  For example:

(a)    PBE knowingly and falsely stated that it "rigorously" tested the SSBS.

(b)    PBE knowingly and falsely represented that a consultant "confirms that Point Blank's SSBS vests are durable, safe, and comply with Point Blank's representations and warranties," when in fact the consultant had not so confirmed, and had never even seen a SSBS vest in person.

(c)    PBE falsely represented that the consultant confirmed that the SSBS "straps simply will not detach from the bird's mouth even after extensive use and aging."

(d)    PBE falsely represented that its SSBS vests had undergone rigorous and proper testing.  In fact, the limited testing that was performed involved SSBS components, as opposed to SSBS vests, which provided irrelevant and unreliable results.  Furthermore, the SSBS components that were tested were not the knockoff Chinese materials currently being used in PBE's SSBS vests; rather, PBE's representations were based on testing of real Velcro and Breathe-O-Prene SSBS components that are not actually used in PBE's SSBS vests.

**G.    The Defects in PBE's SSBS Vests Are Material**

136.    The information PBE concealed about the SSBS and the information it affirmatively misrepresented about the SSBS were substantial factors in influencing the decisions of government agencies and individual law enforcement officers and first responders to purchase SSBS vests.

137.     A vest cannot protect an officer's life if it cannot be properly worn.  All of PBE's SSBS vests at issue have suffered from a latent defect that causes them to fail under ordinary use as prescribed by the manufacturer.  If a wearer's vest falls apart or is at risk of falling apart during ordinary use, it fails to offer the ballistic protection promised by the manufacturer.

138.     Body armor is expensive lifesaving equipment.  When choosing which body armor to purchase, users and government officials have relied on PBE's misstatements as to the durability of the SSBS and its 5-year warranty.  If they had known of the defects identified in this Complaint, they would not have purchased or paid for PBE's SSBS vests.

139.     Indeed, Nikki Pollack, the State Procurement Administrator for Colorado (the lead state for the NASPO Master Contract for body armor), recently testified after reviewing just a small fraction of the documents demonstrating the latent defects identified in this Complaint: "If I was aware of the problem, I certainly wouldn't continue to buy the product."  She additionally testified:

> [Q.] Do you believe that you were kept in the dark—on a fair amount of information that would have been material to you?
>
> [A.] Based on what I've seen today and the information that I've received regarding the vests . . . , there's a significant amount that I was not provided with, yes.
>
> *       *       *
>
> [Q.] Do you believe that law enforcement officers should be entitled to see and review the information that you've seen today and earlier this morning when making a decision on purchasing a life-critical product?
>
> [A.] If I were an officer, I'd want to see it, yes.
>
> *       *       *
>
> [Q.] And as a person making a decision on whether to authorize certain models of vests to be on a list to be sold in your state and potentially others, you would have wanted to see all of this information beforehand; is that fair?

[A.] I would want to provide all the information that is available on the product to the customer and let them make an informed decision about whether or not they want to purchase the vest.

140.     Furthermore, in response to learning of the allegations against PBE described in this Complaint (through the parallel class-action litigation described above), Massachusetts and Texas suspended the purchase of PBE's SSBS vests under their statewide contracts.

141.     Unfortunately, this critical information has long been kept hidden from those who purchased and paid for PBE's SSBS vests.  PBE's knowing misconduct has defrauded the United States and the Whistleblower States out of millions of dollars.

## VI.     CAUSES OF ACTION

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

142.     Relators incorporate by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

143.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the United States of America false or fraudulent claims for payment for defective SSBS vests, in violation of 31 U.S.C. § 3729(a)(1)(A).

144.     Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

### COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

145.     Relators incorporate by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

146.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

147.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

148.    Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

### COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))

149.    Relators incorporate by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

150.    PBE and John Does Nos. 1-50, Fictitious Names knowingly conspired, and are still conspiring, to commit acts in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B).  Defendants committed overt acts in furtherance of the conspiracy as described above.

151.    Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

### COUNT IV
### (Violation of California False Claims Act)

152.    Relators incorporate by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

153.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

154.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

155.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

156.    Because of Defendants' actions, the State of California, including its political subdivisions, has been and continues to be severely damaged.

## COUNT V
### (Violation of Delaware False Claims and Reporting Act)

157.    Relators incorporate by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

158.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code tit. 6, § 1201(a)(1).

159.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or

used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code tit. 6, § 1201(a)(2).

160.    The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

161.    Because of Defendants' actions, the State of Delaware and/or its political subdivisions have been and continue to be severely damaged.

**COUNT VI**
**(Violation of District of Columbia False Claims Act)**

162.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

163.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

164.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and are still making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

165.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

166.    Because of Defendants' actions, the District of Columbia and/or its political subdivisions have been and continue to be severely damaged.

## COUNT VII
### (Violation of Florida False Claims Act)

167.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

168.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Florida, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

169.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its political subdivisions, in violation of Fla. Stat. § 68.082(2)(b).

170.    The State of Florida, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

171.    Because of Defendants' actions, the State of Florida and/or its political subdivisions have been and continue to be severely damaged.

## COUNT VIII
### (Violation of Hawaii False Claims Act)

172.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

173.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

174.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made and used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

175.    The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

176.    Because of Defendants' actions, the State of Hawaii and/or its political subdivisions have been and continue to be severely damaged.

## COUNT IX
### (Violation of Illinois False Claims Act)

177.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

178.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

179.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

180.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid and continue to pay for defective SSBS vests.

181.    Because of Defendants' actions, the State of Illinois and/or its political subdivisions have been and continue to be severely damaged.

**COUNT X**
**(Violation of Indiana False Claims and Whistleblower Protection Act)**

182.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

183.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and are still presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

184.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

185.    The State of Indiana, or its political subdivisions, unaware of the falsity of the

claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid and continue to pay for defective SSBS vests.

186.    Because of Defendants' actions, the State of Indiana and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XI
## (Violation of Iowa False Claims Act)

187.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

188.    Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

189.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

190.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

191.    Because of Defendants' actions, the State of Iowa and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XII
## (Violation of Massachusetts False Claims Act)

192.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though

fully set forth herein.

193. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12, § 5B(1).

194. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12, § 5B(2).

195. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

196. Because of Defendants' actions, the Commonwealth of Massachusetts and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIII
### (Violation of Minnesota False Claims Act)

197. Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

198. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

199.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

200.     The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

201.     Because of Defendants' actions, the State of Minnesota and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIV
### (Violation of Montana False Claims Act)

202.     Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

203.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code § 17-8-403(1)(a).

204.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code § 17-8-403(1)(b).

205.     The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

206.     Because of Defendants' actions, the State of Montana and/or its political subdivisions have been and continue to be severely damaged.

**COUNT XV**
**(Violation of Nevada False Claims Act)**

207.     Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

208.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

209.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

210.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

211.     Because of Defendants' actions, the State of Nevada and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVI
### (Violation of New Jersey False Claims Act)

212.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

213.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting or causing to be presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

214.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(b).

215.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

216.    Because of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVII
### (Violation of New Mexico Fraud Against Taxpayers Act)

217.    Relator incorporates herein by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

218.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.M. Stat. § 44-9-3(A)(1).

219.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to obtain payment for or approval of a false or fraudulent claim by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. § 44-9-3(A)(2).

220.    The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay for defective SSBS vests.

221.    Because of Defendants' actions, as set forth above, the State of New Mexico and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XVIII
### (Violation of New York False Claim Act)

222.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

223.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

224.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

225.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

226.    Because of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XIX
### (Violation of North Carolina False Claims Act)

227.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

228.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

229.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

230.     The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

231.     Because of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXI
### (Violation of Rhode Island False Claims Act)

232.     Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

233.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

234.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and are still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

235.     The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

236.     Because of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXII
### (Violation of Tennessee False Claims Act)

237.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

238.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Tenn. Code § 4-18-103(1).

239.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code § 4-18-103(2).

240.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

241.    Because of Defendants' actions, the State of Tennessee and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXIII
### (Violation of Vermont False Claims Act)

242.    Relator incorporates herein by reference paragraphs 1-141 of the Complaint as though fully set forth herein.

243.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the State of Vermont, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Vt. Stat. tit. 32, § 631(a)(1).

244.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Tennessee, or its political subdivisions, in violation of Vt. Stat. tit. 32, § 631(a)(2).

245.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

246.    Because of Defendants' actions, the State of Vermont and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXIV
### (Violation of Virginia Fraud Against Taxpayers Act)

247.    Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

248.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code § 8.01-216.3(A)(1).

249.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code § 8.01-216.3(A)(2).

250.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

251.     Because of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been and continue to be severely damaged.

## COUNT XXV
### (Violation of False Claims to Government of Puerto Rico Programs, Contracts, and Services Act)

252.     Relators incorporate by reference paragraphs 1-141 of this Complaint as though fully set forth herein.

253.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of P.R. Laws tit. 32, § 2934(1)(a).

254.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of P.R. Laws tit. 32, § 2934(1)(b).

255.    The Commonwealth of Puerto Rico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid and continue to pay for defective SSBS vests.

256.    Because of Defendants' actions, as set forth above, the Commonwealth of Puerto Rico and/or its political subdivisions have been and continue to be severely damaged.

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

A.  That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Del. Code tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Haw. Rev. Stat. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.5-1 *et seq.*; Iowa Code §§ 685.1 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. §§ 2A:32C-1 *et seq.*; N.M. Stat. §§ 44-9-1 *et seq.*; N.Y. State Fin. Law §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code §§ 4-18-101 *et seq.*; Vt. Stat. tit. 32, §§ 630 *et seq.*; Va. Code §§ 8.01-216.1 *et seq.*; or P.R. Laws tit. 32, §§ 2931 *et seq.*;

B.  That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than twelve thousand five hundred thirty-seven dollars ($12,537) or more than twenty-five thousand seventy-six dollars ($25,076) per false claim, as provided by 31 U.S.C. § 3729(a)

and 28 C.F.R. § 85.5,[19] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code tit. 6, §1201(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Del. Code tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[19] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

E.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. 175/3(a)(1)(A), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. 175/3(a)(2), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions

for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of the damages sustained by the Commonwealth of Massachusetts, multiplied as provided for in Mass. Gen. Laws ch. 12, § 5B(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Mass. Gen. Laws ch. 12, § 5B(a), to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Minn. Stat. § 15C.02(a), in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in

Mont. Code § 17-8-403, multiplied as provided for in Mont. Code § 17-8-403(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, pursuant to Mont. Code § 17-8-403(1), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.   That judgment be entered in Relators' favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.   That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. § 2A:32C-3, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, pursuant to N.J. Stat. § 2A:32C-3, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.  That judgment be entered in Relators' favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, multiplied as provided for in N.M. Stat. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.  That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.  That judgment be entered in Relators' favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or

66

indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by R.I. Gen. Laws § 9-1.1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.  That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Tennessee or its agencies multiplied as provided for in Tenn. Code § 4-18-103(a), plus a civil penalty of not less than two thousand five hundred dollars ($2,500) or more than ten thousand dollars ($10,000) per false claim, as provided by Tenn. Code § 4-18-103(a), to the extent such multiplied penalties shall fairly compensate the State of Tennessee or its agencies for losses resulting from the various

schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. tit. 32, § 631(b)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Vt. Stat. tit. 32, § 631(b)(1), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code § 8.01-216.3(A), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Va. Code § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in P.R. Laws tit. 32, § 2934(1), plus a civil penalty of not less than not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as

provided by P.R. Laws tit. 32, § 2934(1), in order to fairly compensate the Commonwealth of Puerto Rico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

Y.     That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit;

Z.     That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

AA.   That this Court award such further relief as it deems just and proper.

## JURY DEMAND

Relators hereby demand a trial by jury on all claims so triable in this action.

Dated:  July 5, 2022                    /s/ W. Scott Simmer

W. Scott Simmer, Bar No. 460726
ssimmer@baronbudd.com
Noah M. Rich, Bar No. 1033799
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone:  202.333.7352
Facsimile:  202.337.1039

*Attorneys for Relators*